## BILL HARRISON v. THE STATE.

### No. 2951. Decided November 30, 1904.

#### 1.—Murder—Evidence—Extraneous Circumstance—Motive.

Where the evidence did not show that the defendant had malice against a whole class to which deceased belonged, it was error to admit testimony that on the evening before the homicide for which defendant was being tried, he asked the State's witness whether he was a "God damn spotter" and that if defendant thought he was, he would knock witness' jaw off — to show motive for the alleged crime — it not being in evidence that deceased belonged to a class known as "spotters," or that in the difficulty between defendant, his companion and deceased, either had accused deceased of being a "spotter," but accused him of being a "prohibitionist."

#### 2.—Same—Charge of the Court—Showing Guilt of Another.

Where the contest between the State and appellant was, who committed the homicide — appellant or the principal State's witness, or if the latter committed it, the State insisted that appellant was a co-principal with him, and the appellant's witnesses testified to confessions the said State's witness had made to them that he committed the homicide and not the defendant, it was error to limit such testimony to the weight that could be given to it as impeaching testimony, instead of allowing the jury to pass upon it as original testimony inculpating said State's witness and exculpating appellant of the homicide.

#### 3.—Same—Where More Than One Participate in Homicide.

Where the evidence showed that appellant and the principal State's witness were present at the homicide, and the State contends that the appellant is guilty of same, or participated with the said witness in the commission of the same, it is legitimate for the appellant to show that the homicide was only committed by the said witness and that the appellant had no guilty participation in the transaction; and where the testimony of his witnesses supported this theory, it was reversible error for the court to charge that the weight of such testimony as impeaching testimony could only be considered by the jury: and that it could not be considered for any other purpose.

**4.—Same—Manslaughter—Charge of Court.**

Where the evidence showed that, either deceased and appellant had a difficulty in which W. participated, and deceased began the assault by striking W. in the eye, causing pain or bloodshed, and W. committed the homicide thereafter, appellant aiding and abetting him; or that deceased struck W. the first blow, and appellant on that account became excited and his mind incapable of cool reflection and he killed deceased, in either case the court should have charged on the issue of manslaughter.

**5.—Same—Implied Malice—Adequate Cause.**

Where the evidence raised the issue of manslaughter, as well as murder and. murder in the second degree, it was error to charge in applying the law of implied malice to the facts, in not requiring the homicide to be done upon malice, but only with intent to kill in a transport of passion aroused without adequate cause — not defining adequate cause. Moreover, in every case where the court defines murder upon implied malice, adequate cause should be defined. Following Boyd v. State, 28 Texas Crim. App., 137; Thomas v. State, 7 Texas Ct. Rep., 818.

**6.—Same—Charge of Court—Accomplice.**

A charge on accomplice testimony which assumes the same to be true is on the weight of the testimony and error.

Appeal from the District Court of Grayson. Tried below before Hon. B. L. Jones.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case. The charge of the court on the testimony of an accomplice after defining an accomplice, was as follows: "Now if you are satisfied from the evidence that the witness Albert Whitten was an accomplice, or you have a reasonable doubt as to whether he was or not, as that term is defined in the foregoing instructions, then you are further instructed that you cannot find the defendant guilty upon his testimony unless you are satisfied that the same has been corroborated by other evidence tending to establish that defendant did in fact commit the offense."

"The defendant cannot be convicted in this case unless you believe beyond a reasonable doubt that there is evidence before you independent of the testimony of Albert Whitten, if you find that Albert Whitten is an accomplice, corroborating the witness Albert Whitten upon material matter, which tends to connect said defendant herein with the commission of the murder charged. A corroboration of the witness, Albert Whitten, if you believe he was an accomplice, as to matters immaterial, and which do not tend to connect the defendant with the murder charged is not sufficient. No matter if you believe the statement of the witness, Albert Whitten, if you find him to be an accomplice, the defendant cannot be convicted unless there is other evidence sufficient, of and in itself, to connect the defendant with the murder charged."

*C. L. Vowell, for appellant.*—It is well settled that in prosecution for murder it is the imperative duty of the court to instruct the jury upon the lower degrees of homicide, if by any possible legitimate construction of the evidence they might convict of a lower degree; and it is only when

the evidence totally fails to raise the issue of a lower degree that the court is relieved of charging upon such lower degree.    Blocker v. State, 27 Texas Crim. App., 16; Neyland v. State, 13 Texas Crim. App., 536; Jones v. State, 29 Texas Crim. App., 338; Chatman v. State, 50 S. W. Rep., 396.

The court should not limit testimony to a particular purpose if it was admissible for all purposes.    Davis v. State, 30 Texas Crim. Rep., 548 (38 S. W. Rep., 174).

The court should affirmatively charge upon defenses raised by the evidence and not pass upon the weight of it by excluding it from the jury.    McConnell v. State, 22 Texas Crim. App., 354; Anderson v. State, 31 S. W. Rep., 673; Bennett v. State, 48 S. W. Rep., 61.

Where in a charge upon murder in the second degree, the court bounds implied malice by murder in the first degree on the one side, and manslaughter on the other, it is necessary that the court define adequate cause, and in every charge upon murder in the second degree the jury should be told that the killing must be unlawful and with maice aforethought.    Whitaker v. State, 12 Texas Crim. App., 436; Brunet v. State, 12 Texas Crim. App., 521; Neyland v. State, 13 Texas Crim. App., 536; Pollard v. State, 7th Texas Ct. Rep., 548; Thomas v. State, 7th Texas Ct. Rep., 818; Bennett v. State, 48 S. W. Rep., 61.

*Howard Martin,* Assistant Attorney-General, *Wolfe, Hare & Maxey* and *Smith & Beaty,* for appellant.—The fourteenth charge given by the court defining implied malice complained of in the third assignment of error is approved in Boyd v. State, 28 Texas Crim. App., 137.

In the fourth assignment of error appellant calls in question the correctness of the sixteenth paragraph of the court's charge because the same does not define adequate cause.    The evidence does not raise the issue of manslaughter.    The issue of murder in the second degree is submitted to the jury in paragraphs thirteen, fourteen and sixteen of the court's charge.    In support of his contention appellant cites, among other cases, Thomas v. State, 7 Texas Ct. Rep., 818, and Pollard v. State, 7 Texas Ct. Rep., 548.    It is to be observed that in the Pollard case, the court's charge did not require the existence of malice in murder in the second degree, while in the Thomas case the charge does not state either an unlawful killing or implied malice as elements of murder in the second degree.

McGrath v. State, 34 S. W. Rep., 941 (on rehearing) and Brittain v. State, 37 S. W. Rep., 758, support the charge given by the court in this case.

It is to be observed that the Thomas and Pollard cases above referred to are based on Whitaker v. State, 12 Texas Crim. App., 436.    In the McGrath case above cited, the Whitaker case is either qualified or overruled.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second 'degree, and his punishment assessed at confinement in the penitentiary for a term of twenty-five years; hence this appeal.

The homicide occurred on the night of the 24th of January, 1904, in the city of Sherman, Grayson County. Deceased, Robert Francis, was employed as bookkeeper at the Grayson County Oil Mill, and on the particular Sunday night was at the office attending to some business. He left the office between 8 and 9 o'clock to go to his home. He went from his office to the Frisco R. R. track, and thence south along said track towards its junction with the Cotton Belt. Shortly before reaching said junction, he was overtaken by appellant and Albert Whitten. Appellant and his companion were shown to be drinking that Sunday evening, and after overtaking deceased an altercation arose between them in regard to prohibition. Whitten, introduced by the State and the only eye-witness, testified: that he and appellant were walking down the railroad, he being a few paces behind appellant. Deceased came along the railroad, going in the same direction with them, and he heard defendant say: "There goes a son of a bitch of a prohibitionist now; and I am going to do him up." They were quarreling and disputing. "I was several feet behind him, and when they got to O'Neal street, they turned east and when near the Cotton Belt railroad, which is about fifty or seventy-five yards of the Frisco railroad, I heard defendant say, 'that any one who was a prohibitionist and pretended to be an anti, was a damn son of a bitch.' Defendant said, 'I am the out-fightingest son of a bitch in this country and can whip you on less ground than you can stand on.' Deceased replied, 'I don't know whether you can or not.' At this time Francis was facing west and defendant was facing east. Defendant drew back to strike deceased. I caught his hand with my left hand and cut my hand and told him to go on home. Deceased said 'What have you got to do with it?' I was standing north of the two and about opposite the middle distance between them. One of them struck me in the eye—I don't know which one it was. Then defendant began striking Bob Francis, and I could not see anything else on account of my eye hurting. Defendant and I then started south and when we had gone a little distance in the direction of his home, defendant gave me his knife and said he would slip back and see if anything was doing, and he would afterwards meet me at the bridge on the railroad," etc. It appears from other witnesses that in the encounter deceased received several severe cuts on the left side of the head and near the ear: one about the base of the ear, which severed the jugular vein and pierced the pnumogastric nerve. One of the cuts on his head severed the "temporal" artery. After the difficulty, appellant and his companion left, going to the home of appellant. Deceased immediately returned to his office at the Oil Mill. He bled to death in a very short time afterwards. Several parties came in before he died, but deceased is not shown to have been able to disclose whom it was that cut him, or any of the details of the difficulty. Shortly afterwards on the same night, appellant Harrison

was arrested in his mother's house. Whitten, who was there at the same time, left the house without being discovered and went to his half-brother's (Estes') who lived in Sherman. Sometime after arriving there, the officers came to arrest him, but he escaped, and was arrested two or three days afterwards in the Indian Territory. The knife with which the cutting was done was found concealed between the ceiling and wall of the house of appellant. The State claims that it was concealed there by appellant, and defendant's explanation was that he intended to place it on the wall at the instance of Whitten, whose knife it was; and that, in placing it there, it fell down between the wall and the ceiling. It was found in pursuance of a statement to the officers by Whitten. When found it had blood on the blade, which was gapped. The State used Albert Whitten as a witness whose testimony as to the difficulty was as stated above. The State's theory predicated mainly on said witness was, that the killing was done by appellant, who had previously borrowed the barlow knife from said Whitten, and had used it in the assault; and that Whitten only interfered to separate the parties, when he received the cut on the left hand as stated, and also received a lick in the eye. On the contrary, the theory of the defendant was that the homicide was committed by Albert Whitten. The confession introduced by the State, as made to the sheriff, is substantially, as follows: That Francis came out of the mill office, and they came up with him; and he and Whitten got to talking and Whitten asked him, "If he was not a Prohibitionist," and he told him, "Yes, and asked him what he was?" That the parties were ahead of him, and after disputing awhile they got to fussing and fighting, and Francis knocked Whitten down, and about the time he got to where they were it was all over; and that he took Whitten off and went down south from there into an old field; that he proposed to go back and see what had become of the man, and Whitten said his eye was hurting him so that he could not go; that Whitten then went on up to the bridge, and he went back but did not find the man. When he went to the bridge where Whitten was to wait, he was gone. He then went to Jennie Benson's and from there home. This witness further stated that by the time he got to Francis and Whitten the fight was about over. To the best of his recollection he heard deceased say, "Pardner, you have used unfair means with me, you have cut me with a knife." And Whitten said, "You hit me with a pair of brass knucks." It was shown that deceased and appellant had worked at the same oil mill, but the record fails to show that they recognized each other the night of the homicide. This is a sufficient statement of the case to discuss the assignments of error.

Appellant's first bill of exceptions calls in question the action of the court in regard to the admission of the following testimony: John Neff, a witness for the State, was asked the following question, "State what defendant said to you at the Union Depot about 5 o'clock on the afternoon before Robert Francis was killed that night." And he answered, "He asked me if I was a God damn spotter?" and to which

witness replied, he was not; that he worked there at the depot. Defendant then said, "If I thought you were I would knock your jaw off." This testimony was objected to because the same sought to elicit evidence that was immaterial and irrelevant; had no connection with the transaction for which defendant was being tried, and would only tend to prejudice the jury against defendant. The court appends an explanation to this, which appears to us to be irrelevant. The only theory upon which this evidence could be construed admissible is, as claimed by the State, that it would serve to shed some light on appellant's motive for the homicide, that is, it would tend to show that appellant had animus against any person who was a "spotter." It is sometimes permissible to resort to apparently extraneous circumstances in order to show a motive for the alleged crime. Under this head, it is sometimes permissible to show that appellant had malice against a whole class; and that a difficulty occurred with one of such class. The testimony here tends to show that appellant had such a hostile feeling against persons who were "spotters," whatever that may mean. If, in the altercation between appellant and deceased, he or his companion Whitten had accused deceased of being a "spotter," it might have some semblance of bearing on appellant's motive. If we regard "spotter" as being a detective of those violating the prohibition law, the evidence does not show that appellant or Whitten accused deceased of being a "spotter," but merely of being a prohibitionist. It does not occur to us that the testimony was admissible.

The next bill of exceptions shows that on the same evening, appellant and Albert Whitten, who were together, had a difficulty with a party whom they charged with being "a spotter." This was introduced in evidence, and subsequently excluded by the court. We do not believe it should have been admitted.

Appellant objected to the following portion of the court's charge: "Any testimony that has been admitted by the court to the effect that any witness has at some other time made a statement or statements inconsistent with, and contradictory of the evidence of such witnesses admitted before you on this trial, may be considered by you in weighing and determining the weight you will give the testimony of such witnesses, and for no other purpose." This was objected to, because the effect was to entirely exclude from the consideration of the jury all of the material testimony of Mrs. Smith, Georgia Smith and Mrs. Harrison as to the declarations of Albert Whitten, made to them by him, in regard to his connection with the killing. Albert Whitten had been used as a witness by the State, and these witnesses contradicted him as to the statements there made; and his statements there made were clearly admissible as original testimony, and this charge should have been applied to no witness, except Mrs. Smith, who was contradicted by J. M. Blain as to the matter Billie Harrison had told her the night before—that Bob Francis was dead. It will be observed in this connection, that appellant also requested a charge limiting the effect of the

contradictory testimony between the State's witness, J. M. Blain, and the defendant's witness, Mrs. Smith. If the testimony of the witnesses, Mrs. Smith, Georgia Smith and Mrs. Harrison was original testimony as to the declaration that Albert Whitten made to them on the night of the homicide, then, in our opinion, the charge of the court was not only erroneous but injurious to appellant. As heretofore stated, the contest between the State and appellant was, who committed the homicide—appellant or Whitten; or if Whitten committed it, the State insisted that appellant was a co-principal with him. For the purpose of establishing this theory, the State introduced Albert Whitten, who testified as heretofore shown, to a state of facts exonerating himself and inculpating· defendant. All the testimony the defendant was able to avail himself of on his behalf, was testimony introduced by the State of appellant's confessions and statements made to the sheriff Russell as to how the homicide occurred. Appellant exonerated himself and laid the blame of the homicide on Albert Whitten. In this attitude of the case, it occurs to us, that any legal testimony that appellant could offer to the effect that the witness Whitten was responible for the homicide and he was not culpable therein, should have been permitted by the court. Now, any evidence that would be admissible against Whitten, if he were being tried, it seems to us, would be admissible in favor of defendant. No question will be made that if Whitten was being tried for the homicide, his confessions would be admissible against him. The testimony of Mrs. Smith, George Smith and Mrs. Harrison, while contradictory of the evidence of Whitten on the point, at the same time showed that Whitten on the night of the homicide and shortly thereafter confessed to them that he alone was responsible for the homicide. We quote from Mrs. Smith's testimony, as follows: "We (Georgia and myself) stayed out Sunday night with my daughter (Mrs. Harrison) and we were at her house when Albert Whitten came there. When he came in the house he had a great deal of blood on his face and on his left hand and left sleeve. He had some blood on his shirt. He had a badly hurt eye and complained of it a great deal. I asked him what was the matter and he replied that he had been in a fight. Mrs. Harrison asked him where was Billy, and he said that Billy was all right and had nothing to do with the fight. He shook his vest and said that he had gotten pretty wet out at the hydrant. He then took the lamp and went into an adjoining room and looked into a mirror at his eye. While he was standing there I saw blood drop out of the left coat sleeve at the elbow on the dresser. I know that this was blood because I saw it when it dropped, and I saw it there afterwards. At this time defendant had not come home. Albert told all of us that he had gotten into a quarrel with a man up on the Cotton Belt railroad about prohibition, and that the man had knocked him down with brass knucks and as he got up he jerked out his knife and began cutting on him. That he could hear the blood spurt, and that Billy had gone back to see how the man was. Albert Whitten

then stepped to the door and called me; I went to the door, and he reached under the stove or under the side of the house, and picked up something and brought it into the house and showed me the knife and said, 'This is what I did it with.' The knife was bloody and the blade was gapped. I asked him what gapped the blade, and he said that he did that over the damn son of a bitch's bones. Defendant then came home and stated that he had gone back where the fight occurred and that he supposed Francis had gone home. Albert Whitten showed him this knife and defendant asked Albert Whitten why he used a knife, that this defendant's fists were as good a weapon as he wanted." The other witnesses testified to the same effect. As stated, no one will question the admissibility of this evidence against Whitten were he on trial, and under the authorities any testimony that would legitimately fasten the crime on him, and so go wholly, or measurably, to the exculpation of appellant would be legitimate testimony on his behalf. There are some early decisions to a different effect, but all of the later decisions are in favor of the proposition contended for by appellant. The rule is now well established that evidence which merely shows some animus or hostility of some third person against the deceased and no proximate connection with the killing, will not be admitted. But where, in conjunction with such animus or hostility, evidenced by acts or threats of some third person, and there is evidence further tending to connect such third person proximately with the homicide at the time of its commission, such testimony will be admitted. Dubose v. State, 10 Texas Crim. App., 230; Hart v. State, 15 Texas Crim. App., 202; Coffelt v. State, 19 Texas Crim. App., 436; Kunde v. State, 22 Texas Crim. App., 65; Murphy v. State, 36 Texas Crim. Rep., 24; Sawyers et al. v. State, 15 Lea (Tenn.), 694.

We quote from Dubose's case, supra, as follows: "We are therefore of the opinion that when the issue on the trial is whether the defendant did the killing, he has the right to show some other person committed the homicide, by the same character of evidence relied upon by the State for the conviction. If, however, the facts show that more than one person participated in the homicide, this evidence would possess no tendency to weaken the case as made by the State, and should therefore be rejected, unless under peculiar circumstances which we will not attempt to give at this time." And again: "The exception is made in cases purely circumstantial. Suppose, however, that the State relies in the first instance upon positive proof, and the defendant meets that proof with positive evidence that some other person killed the deceased; now, in corroboration of their witnesses either party would have the right to prove motive, threats, and in fact all other inculpatory facts." It will be noted here that the opinion states that, where more than one person participated in the homicide, in the absence of peculiar circumstances it would serve no useful purpose to prove that some other person committed the homicide. Here, it occurs to us, we have the peculiar circumstances which justified the resort to this character

of testimony.  Two parties are confessedly present at the commission of the homicide.  If both participated in it, both are equally guilty. But here the State contends that appellant is the only guilty one of the two, or if Whitten is guilty, appellant participated with him.   While appellant contends that the homicide was committed solely by Whitten, and that he had no guilty participation in the transaction.   The reason of the rule finds application in the doctrine, that any legal testimony which will serve the purpose of fastening the homicide solely on Whitten, and so exculpating appellant, should be admitted on his behalf.   Otherwise, it would be in the power of the State on this trial to convict appellant, though he might not be guilty, because he could not use the confession of Whitten; and subsequently turn around and convict Whitten on his confession; or Whitten in the first instance could be convicted on his confession, and then the State, if it is authorized to deprive appellant of the benefit of Whitten's confession, might convict him of the murder upon other testimony.   Kunde's case, *supra,* is very much in point.   There the acts and declarations of the third party showing animus towards the deceased and motive on his part to commit murder, were admitted in evidence in connection with facts tending to show a connection on his part with the homicide.   Here we have much more than anterior acts; we have a direct confession which, while it inculpates Whitten, exculpates appellant.   We would furthermore observe in this regard that an issue in this case was whether or not Whitten was an accomplice, and this was submitted by the judge in his charge to the jury.   In Coffelt's case, *supra,* this character of evidence was held competent for the purpose of showing that the witness was an accomplice.   As we have seen from the above charge, the learned judge who tried the case, limited this testimony of Mrs. Smith and Georgia Smith and Mrs. Harrison to impeachment purposes, whereas, it was competent not only to impeach the witness Whitten, but as original testimony inculpating him and exonerating appellant; and also to fasten on him as a witness that he was an accomplice.   Consequently, the limitation of the court was exceedingly hurtful and injurious to appellant.

Appellant further complains of the court's failure and refusal to give a charge on manslaughter: the court having only charged the jury on murder in the first and second degrees.   An examination of the record suggests to our minds that appellant was entitled to the benefit of a charge on manslaughter, on either of two theories suggested by the testimony.   If deceased and appellant had an altercation in which Frank Whitten participated, and deceased began the assault by striking Frank Whitten in the eye, causing him pain or bloodshed, and Whitten committed the homicide thereafter, and appellant aided and abetted him, it might have been no more than manslaughter on the part of Whitten, and it might have been manslaughter on the part of appellant, who aided and abetted him.   Or, if deceased struck the first blow, hitting Whitten, and appellant on that account became excited

and incapable of cool reflection and killed deceased, he might be .guilty of no more than manslaughter. We understand these theories arise from the testimony of Whitten and others. It will be understood that we are here simply passing on the right of appellant to have an instruction on this subject, for, if the evidence raised manslaughter, he was entitled to have the jury pass on that issue, as a defense against the accusation of murder.

Appellant also insists that the court committed an error in failing to properly define murder in the second degree upon implied malice. The court's charge is, as follows: "Implied malice is that which the law infers from or imputes to certain acts, however suddenly done; thus, when the fact of an unlawful killing is established, and the facts do not establish express malice beyond a reasonable doubt, nor tend to mitigate excuse or justify the act, then the law implies malice, and the murder is in the second degree; and the law does not further define murder in the second degree, than if the killing is shown to be unlawful, and there is nothing in evidence, on the one hand, showing express malice, and on the other hand there is nothing in evidence that will reduce the killing below the grade of murder, then the law implies malice, and the homicide is murder in the second degree." Again, "If you believe from the evidence, beyond a reasonable doubt, that the defendant, with a deadly weapon or instrument reasonably calculated and likely to produce death by the mode and manner of its use, in a sudden transport of passion, aroused without adequate cause, and not in defense of himself against an unlawful attack, reasonably producing a rational fear or expectation of death or serious bodily injury, with intent to kill, did stab and cut with a knife and thereby kill Robert Francis, as charged in the indictment, you will find him guilty of murder in the second degree," etc. The contention here is, that this charge does not require the killing to be done upon malice, and only requires it to be done in a transport of passion aroused without adequate cause, and nowhere defines what is adequate cause. We believe appellant's contention is correct. See Whitaker v. State, 12 Texas Crim. App., 436; Burnett v. State, 12 Texas Crim. App., 521; Neyland v. State, 13 Texas Crim. App., 536; Pollard v. State, 7 Texas Ct. Rep., 548; Thomas v. State, 7 Texas Ct. Rep., 818. The case here is not like the cases of McGrath v. State, 35 Texas Crim. Rep., 43; Brittain v. State, 36 Texas Crim. Rep., 406, cited by the State. In said cases the element of manslaughter was not involved, although the charge was considered erroneous. In defining murder upon implied malice, yet under the facts of these cases, manslaughter not being at all involved, the error in the charges was not considered of a reversible character nor would it be error here if manslaughter were not in the case. Here, manslaughter is in the case. Moreover, we believe in every case where the court defines murder upon implied malice as in this case, adequate cause should be defined. For form of charge see Boyd v. State, 28 Texas Crim. App., 137, cited in Thomas v. State, 7 Texas Ct. Rep., 818.

No bill of exceptions was taken to the court's charge on accomplice testimony, but in view of another trial we call the court's attention to the fact that said charge is upon the weight of the testimony. Bell v. State, 47 S. W. Rep., 1010; Jones v. State, 72 S. W. Rep., 845.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*