JACK SATTERWHITE v. THE STATE.

No. 3570. Decided June 9, 1915.

**1.—Murder—Evidence—Other Offenses—Accusing Others of Crime.**

Where, upon trial of murder, the defendant sought to show that other parties had opportunity to commit the crime, there was no error in the refusal of the court to permit the defendant to prove that just prior to the alleged homicide certain night burglaries were committed in this community for the purpose of theft or robbery, it not being known who these parties were, etc.; and this, although the evidence was purely circumstantial. Davidson, Judge, dissenting.

**2.—Same — Evidence — Circumstances — Opinion of Witness — Shorthand Facts.**

Upon trial of murder which depended upon circumstantial evidence, the defendant should have been permitted on cross-examination of the State's witness to show that the location of the dead body of the deceased was such that there was no obstruction and that a person of ordinary height on foot could easily have seen the body lying where it was found; this was not an opinion of the witness, but a short rendering of the facts, and it being an issue in the case was relevant testimony.

**3.—Same—Evidence—Contradicting Witness—Recalling Witness.**

Where, upon trial of murder, a State's witness who testified and was excused, the witness should not have been recalled by the State, and excerpts of her written testimony given by her before the justice of the peace at a coroner's inquest read to her in the presence of the jury, she not having testified to a different statement before the jury to what she made before the coroner's inquest. Prendergast, Presiding Judge, dissenting.

**4.—Same—Evidence — Circumstances — Watch — Time of Commission of Offense.**

Where, upon trial of murder, the prosecution depended upon circumstantial evidence and the State had introduced in evidence the statement of the defendant that he had not seen deceased after a certain hour of the night in which the homicide was supposed to have been committed, there was no error in admitting in evidence certain matters connected with the finding of a watch on the body of the deceased and that it showed on the dial of the watch that it had stopped running at a certain hour. Davidson, Judge, dissenting.

**5.—Same—Evidence—Grand Jury—Unknown Instrument.**

The acts and conduct of the grand jury are not admissible in evidence against the accused, unless it be shown that the grand jury could have known the character of the instrument by which the homicide was committed, and where no issue of this kind was raised, such testimony was inadmissible.

**6.—Same—Sufficiency of the Evidence.**

See opinion where doubt is expressed by one of the judges of this court that the evidence is sufficient to sustain a conviction.

Appeal from the District Court of Kerr. Tried below before the Hon. R. H. Burney.

Appeal from a conviction of murder; penalty, twenty-five years imprisonment in the State penitentiary.

*Lee Wallace* and *H. C. Geddie,* for appellant.—On question of other offenses: Hart v. State, 15 Texas Crim. App., 202; Gilder v. State, 61 Texas Crim. Rep., 16, 133 S. W. Rep., 883, and cases cited in opinion.

On question of insufficiency of the evidence: Pogue v. State, 12 Texas Crim. App., 283; Johnson v. State, 52 Texas Crim. Rep., 510; Landers v. State, 39 id., 671.

*C. C. McDonald,* Assistant Attorney General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of murder. The indictment charges deceased to be named Walter Dobson. The punishment was twenty-five years in the penitentiary.

The statement of facts is quite lengthy, and purely circumstantial. Appellant was working as night engineer of the ice and light plant in Kerrville at time of alleged homicide, which occurred supposedly on the night of the 11th of July, 1914. On the 15th appellant was arrested. The deceased had spent some time in Kerrville prior to the homicide and had gone away. On the night of the 10th of July deceased came to Kerrville, accompanied by two parties from San Antonio. The evidence indicates that he came to Kerrville to marry Miss Carrie Butler. The day following his arrival at Kerrville he went to see the girl, the testimony indicates, three times, morning, afternoon and night. About 10 o'clock Saturday night he left her house and went to the home of Jake Reinhardt, where he was rooming, and stated that he was going to the ice plant. He was very despondent and crying, and said he had not found what he expected to find, referring to the girl, and that he might not come back that night. He went to the ice plant about 11 o'clock. At this time appellant, Polly and Holsworth, the owner of the plant, were present. Shortly after Holsworth left. After Holsworth left appellant went to the home of Will Reno, a blacksmith, who lived near appellant, and got the keys to the shop, and returned to the ice plant with a bottle of whisky. This whisky he had placed in the shop the afternoon before, same having been given to him by Ress when he paid his bill at the saloon on that afternoon. It was his custom to leave whisky at this shop because he did not want his wife or mother to know he used it. After taking the bottle of whisky to the shop the evidence of Polly, the only evidence in the record on this phase of the case, shows that appellant, Dobson and Polly took about three drinks, and about 2:20 o'clock in the morning of the 12th Polly says he went to bed, leaving appellant and Dobson at the plant. He further testifies that about 3:40 o'clock appellant waked him up where he was sleeping in the laundry some hundred feet from the plant and talked with him while he was putting on his clothes. Polly asked appellant

where his friend was. He replied that he ·drank his whisky and left a little while prior to the conversation. Some conversation came up between the parties as to a stickpin that deceased was wearing, which, it seems, was a Mexican topaz, appellant stating that deceased had won it in a poker game. Appellant had on the same clothes that he had on when Polly went to bed, and there was no blood on these clothes, and no signs of a struggle about the plant; in fact, no evidence of any crime having been committed about the ice plant. Appellant went home early the next morning and went to sleep as usual. The record also shows at no time before or after the finding of the dead body did appellant show any fear or apprehension or any disturbance of mind. Monday afternoon the body of Dobson was found at the oil tank, 210 yards in direct line away from the ice plant, and much further than the usual traveled route. There is a cedar yard where cedar timber is stacked between the plant and the tank. The tank is by the side of the railroad track, and there are no lights near that place. The skull of deceased was crushed or caved in on top and an irregular piece of skull something like two inches in diameter driven into the skull. On the side of the head were two wounds, one of which cut through the top of the ear and fractured the skull. These seem, however, not to have been fatal. The face and head were swollen and discolored, and the evidence showed that the wounds producing these swellings and discoloration occurred at least thirty minutes before death ensued, and that the blow on the head produced instant death. There was a great deal of blood on the body and hand, coat and vest of the dead man. He had a watch and chain and five cents in money. He had been seen with some currency bills on the afternoon of Saturday by one of the Butler girls. On the following Tuesday a hammer belonging to John Williams was brought to Huntington, who had taken great interest in the investigation of the case. Williams was an enemy of the deceased, and was day engineer at the plant. Williams testified that this hammer he used to drive spikes in poles. It was also used some about the plant to break coal. There was no evidence as to where the hammer was Saturday night or at any time until Tuesday. There was no blood on the hammer, but Huntington said he scraped a small speck of substance from the face of the hammer which, under the microscope, the doctors said they believed to be animal matter—fatty substance. Two people ate their lunches in the plant at night and two in the daytime. A chisel was also picked up somewhere about the plant, which seems to have been a broken one. As we recall this part of the testimony, the chisel is shown to have had the usual place for inserting a wooden handle, but this cavity was unoccupied by a wooden handle, and just on the inside of this was a speck which one of the witnesses said he thought was blood, but it was not analyzed. It was a dark substance and may as well have been paint or crude oil. Two men came to Kerrville with deceased from San Antonio, and the following day moved to the same place where deceased roomed to room; that deceased had selected a place in the yard to sleep under the trees. They requested

to sleep in the yard and did so sleep. The evidence shows deceased and the two San Antonio men who came with him met in a saloon in San Antonio. They seem to have been strangers at that time. There was a great many strange Mexicans in the town of Kerrville at the time, two families of Mexicans lived in box cars just across the track from where the body was found. There is evidence also that about 3 o'clock or between 3 and 4 in the morning and the time the State claims the homicide occurred, two men were seen and heard running hurriedly from the direction of where deceased's body was subsequently found. They were seen within one hundred yards or such matter of this spot. This may be a sufficient statement as a predicate for discussion of the questions.

There are two or three bills of exception reserved to the refusal of the court to permit the defendant to prove that from the 3rd of July to and including the 10th, burglaries for the purpose of theft or robberies, as some of the witnesses term it, had occurred in Kerrville, a town of about twenty-five hundred inhabitants. Among other houses, the residence of the district judge, Hon. R. H. Burney, was burglarized and property taken therefrom. Who these parties were was not known. Without going into a detailed statement of this evidence as shown, these bills of exception show that it could have been proved by these witnesses, including the district judge, that these various houses had been burglarized and property taken and by unknown parties. We are of opinion this testimony should have been admitted. This being a case purely of circumstantial evidence, and the State relying upon the testimony already indicated to connect the defendant with the homicide, which mainly grew out of the fact that he had been the last party seen with deceased before his dead body was found Monday afternoon, this testimony should have been admitted. The State introduced statements of the defendant showing deceased had left the ice plant in good health and no harm had been done him up to that time, and that he had never seen him afterward. It was permissible to show by the same character of testimony upon which the State relied, that some other party may have killed the deceased. If robbery was the incentive or motive for the killing, these unknown burglars had as much motive to kill him for his money as did appellant. The idea that appellant had any money after the homicide is excluded by all the testimony. The court did permit evidence of the fact that these two men came from San Antonio with deceased and went to the same place and were sleeping outdoors with him. The court did also permit testimony suggesting the theory of suicide. Deceased stated he intended to commit suicide, and had selected a place and means of doing it. There is evidence going to show that someone had climbed to the top of the oil tank, as there were tracks found at the top. The body of deceased was found at the oil tank lying in a peculiar position on his back with both hands under his back, and one leg drawn up, and his hat over his face or partially so. There is evidence also in this connection that the homicide did not occur Saturday night. The doctors testified at the time

the body was found Monday afternoon that it had been dead from twenty to twenty-four hours. They gave their reasons from an examination of the body why their statement would be correct. There is. evidence also that this body was not at the oil tank during Sunday. One witness testifies he was city scavenger; that he passed there on horseback, and as we recall, within fifteen feet of where the body was. subsequently found, and the body was not thereon Sunday evening. There was no blood found on the person or clothes of appellant. This is made clearly to appear. Under all these circumstances it is dis-- coverable that the State was relying entirely upon circumstances, which were meager and decidedly lacking in cogency. The State having intro- duced evidence that appellant was not with deceased after he left the ice plant, it certainly was permissible to show circumstances which put it within the power of others to commit the homicide. The unidentified burglars seem to have been in the business of robbing houses to obtain property which did not belong to them. Of course, we understand that. where a burglar enters a private residence for the purpose of looting the house and taking away property, it is within his contemplation that a homicide may result. He is on missions of thievery or robbery, or any other violent way of taking property belonging to his fellow man. The motive would be as strong on the part of the burglars, if robbery was the proposition to be imputed to appellant, as it would be on ap- pellant's part. There is evidence also to the effect that Jack Polly,. whenever the homicide was discussed, would become nervous and excited. These theories are all in the case made by the circumstances and facts,. and went to the jury except with reference to these nocturnal burglaries. We are of opinion that this testimony was clearly admissible, and it was error to discard it. Dubose v. State, 10 Texas Crim. App., 230; Hart. v. State, 15 Texas Crim. App., 202; Blocker v. State, 55 Texas Crim. Rep., 32; Wheeler v. State, 56 Texas Crim. Rep., 547; Kirby v. State,. 49 Texas Crim. Rep., 517; Harrison v. State, 47 Texas Crim. Rep., 393; Kunde v. State, 22 Texas Crim. App., 65; Golin v. State, 37 Texas. Crim. Rep., 90; Murphy v. State, 36 Texas Crim. Rep., 24; Skidmore v. State, 57 Texas Crim. Rep., 497. In the Wheeler case, supra, quite a number of cases are cited which are in point. A great many other cases might be cited, but they will be found collated in the opinions. above mentioned.

Where the State relies upon circumstantial evidence to connect the defendant with the crime, the defendant may prove by the same character of testimony that others committed it and that he did not. This. being a case of circumstantial evidence on the part of the State, the defendant had the legal right to prove the crime upon others by the same character of testimony, or introduce to the jury this character of testimony to show that other parties probably did the killing. The State introduced appellant's statements, by which it was bound, unless. disproved, that he did not see the deceased after 2:20 o'clock that night, at which time he was alive and leaving appellant. The evidence shows deceased was killed subsequently to that if killed that night at all.

The evidence tended strongly to show that he was not killed Saturday night. If the doctors were correct, the body being found Monday afternoon, then the deceased had not been dead exceeding twenty-four hours. A witness also testified that the body was not at the place Sunday evening where it was found Monday evening. Appellant's clothes had no blood on them. If the body was not at the tank at the time of the killing, and was subsequently moved there, appellant could not have moved it without getting blood upon his clothes. So taking these bills of exception and the recitations in them, we are of opinion that it was not only permissible but it was a very important matter that defendant be permitted to prove that these unknown burglars may have killed deceased, and this especially when it is shown that appellant did not see him after 2:20 o'clock Saturday night, and the killing occurred after that time. Under the authorities cited the court was in error. This testimony was admissible.

Another bill recites that while the witness Turner for the State was being cross-examined by the defendant with reference to the location of the dead body and the surroundings of that locality, he was asked if it was not a fact that immediately north of the spot where the body was found there was no obstruction, and that a trailway led up to the negro portion of the town and the ground was practically level, and that a person of ordinary height, on foot, could easily have seen the body lying where it was found. The State objected on account of its irrelevancy, and that it called for an opinion of the witness. The purpose of the question and the testimony to be elicited thereby was to show that there was a trailway leading near and immediately north of the spot where the body was found, and that there was no obstruction between this trailway and the spot where the body was found, and that people passing along said trail during Sunday going to and from town could easily have seen the dead body, if it had been where found, and the defendant would have shown by the witness, had he been permitted to answer the question, that there is a trailway running by said spot, immediately north of it, and that there is no obstruction between the trailway and the place where the dead body was lying, and that a person of ordinary height could easily have seen the body lying where it was found had it been there. The objection made by the State was sustained by the court, and the witness was not permitted to answer or detail the testimony sought to be elicited. The court qualifies this bill as follows: "That said witness was permitted to state the condition of the ground, the trailway and the like, and no objection to his doing this was urged by the State. The objection urged by the State, and sustained by the court, was to the question which called for the opinion of the witness, towit: 'Whether a person of ordinary height on foot could easily have seen the body where it was found,' presumable from the trailway. With this explanation the bill is allowed and ordered filed." This bill is thus signed by the judge. We are of opinion this testimony is clearly admissible. This may be what is usually termed in our law books a shorthand rendering of the facts, and if an opinion

at all, comes within that rule; but we believe it is not an opinion; it is a fact. If it could be shown by this witness passing along in plain view of where the body was found that a man of ordinary height could have seen the body if there during Sunday, it was a fact. The witness may have stated the nature of the ground, contour of the surface of the earth and all that, but this did not convey the definite idea to the jury that the parties passing along were in such position that if the dead body was at the tank during Sunday it could have been seen. One witness was permitted to testify that he rode along this trailway on horseback on Sunday, and his evidence makes it positively certain the body was not there. The fact that this witness swore that it was not there, or that he did not see it there did not render the other testimony inadmissible. Appellant could prove the same facts by all the witnesses if they had been permitted to so swear.

Another bill recites that Leartie Butler, the young sister of Carrie Butler, whom deceased came to Kerrville to marry, testified, was excused and retired from the witness stand, and the State then recalled her and offered to read to her in the presence of the jury excerpts from her written testimony given by her when she testified before the justice of the peace at the corner's inquest held after finding the body of deceased. Appellant objected for various and sundry reasons. This evidence was then read to the jury as follows: "On Saturday afternoon Mr. Elam paid me. I went to Mr. Dobson to get change for a quarter, and when Mr. Dobson pulled out his purse to give me change, he only had twenty cents in small change and was not able to give me change for the quarter, but he just gave me the twenty cents he had in change and told me to keep it. At this time I had occasion to notice his purse and contents. Mr. Dobson, in trying to make the change displayed a large roll of bills. I can not say how much there was in the roll, but the purse was a new and very large one, and looked to be well filled." The court qualifies this bill by stating that the district attorney did not agree to the foregoing bill because it did not fully state and explain the matters connected with the introduction of the testimony objected to. He says: "I herewith state by way of explanation that this witness was a young girl fourteen years old, as shown by the evidence; that she was called to testify by the State; that when first called she failed to say that she had seen a large roll of bills in deceased's possession, and only stated that she saw a five and ten-dollar bill at the time mentioned. Some two or three days later, Sunday intervening, she was again called as a witness and testified that in addition to the five and ten-dollar bills which she had testified when first called, she had seen a large roll of bills in Dobson's purse but did not see the denomination of any but the two mentioned. Thereupon the defendant's attorney gave her a very rigid cross-examination—why she had not told this when first on the stand, how was it she now told it, and had not Judge Storms told her she had made a mistake, and how often he and the district attorney had talked to her since she was on the stand before, where she had been since Saturday night, and who with and where she had been Sun-

day, etc., and how she came to come back on the stand to tell this, and much more along the same line, calculated and intended to discredit her said statement last made in the minds of the jury, and the State offered her testimony taken at the inquest as shown, to corroborate her statement made in the particular named, and for no other purpose as fully explained by the district attorney at the time." This is signed by the judge. The contents of this bill may be stated as showing that they called this girl to the witness stand to testify a second time, she not having testified about the bills on the first, and finally after testifying to the five and ten-dollar bills, instead of proving by her that she had seen this large roll of money mentioned, they asked and proved by her that she had testified as set out in the bill at the coroner's inquest. The court's explanation, it occurs to us, intensifies the error in permitting her testimony to go to the jury. If appellant had shown she had made contrary statements to her testimony on the witness stand they might then introduce testimony sustaining her statement made at other and different times under legal principles. But that was not the case. She did not make a different statement before the jury to what she made before the coroner's inquest. She had not testified to everything before the jury to which she testified before the coroner. A rigid cross-examination of the witness does not authorize corroboration of the witness. She must be placed in the attitude of having changed her testimony or testified differently now from what she had formerly stated. Probably if the State had asked her originally about the large roll of bills or called her attention to it she would or may have so testified before the jury. The bill excludes the idea of any predicate laid to contradict or impeach her testimony. It was simply a rigid cross-examination on what she did testify. It was, in other words, a failure on the part of the girl to testify to the large roll of bills, and a rigid cross-examination in reference to that matter. This did not authorize the introduction of this testimony as a means of corroboration.

Another bill was reserved to the introduction of certain matters connected with the watch found on the body of deceased. The bill recites that this watch was found on deceased; it was an old, large, open-face silver, or apparently silver, watch. The witness identified the watch as the one found on the person of the deceased at the time his body was found, and stated that the watch was not running at the time, and that it had not been running since. That the district attorney then offered in evidence the watch and chain, and also offered in evidence the time indicated on the dial of the watch. Appellant objected, contending the testimony was not admissible in the absence of proof of the fact that the watch was running prior to the time deceased was killed. That the watch stands introduced to show that the chain was broken. Appellant objected to that part of the testimony as to what the dial on the face of the watch showed being introduced, and called the attention of the jury that it stopped at 3:40, because it had not been shown that the watch had been running prior to the time the man was killed, if he was killed, or when it had been wound up, or the fact

that his being killed stopped it, or anything of that sort; that the watch had not been examined by any jeweler or anybody to show that there has been such an injury inflicted upon it as would stop it from running. That there was no predicate laid for the introduction of the testimony, etc. The court overruled these objections, and stated it would be introduced "as a circumstance for what it was worth." We are inclined to the opinion that upon another trial it should not be permitted to go to the jury, unless there is some evidence going to show that the watch had been running or was in condition to run prior to the time that it was found on the body of deceased. There were no bruises found about the body of deceased where the watch was found. If the watch had been running and for some reason occurring at the time of the homicide if the watch had stopped at that particular junction, it might be a fact for the jury to consider. We are of opinion that upon another trial this testimony, unless connected up in some way, should not be permitted to go to the jury. The majority are of opinion the dial of the watch indicating 3:40 o'clock as time of stopping its running is admissible.

There is a lengthy bill reserved to the action of the court permitting the State to prove the acts and conduct of the grand jury in their investigation of the case, which was very thorough and full. The court said that the reason he permitted this testimony was in explanation of the second count in the indictment, which charged the killing occurred by some means to the grand jury unknown. If it had been an issue in the case that the grand jury could by reason of diligence ascertain the means by which the killing occurred, and evidence was introduced contesting the second count of the indictment on that proposition, this testimony might have been admissible under an array of authorities commencing with Jorasco v. State, 6 Texas Crim. App., 238, but that character of evidence is not admissible unless there is an issue of that sort. The acts and conduct of the grand jury are not admissible in evidence against the accused. However, if there had been such and the defendant was relying upon a defeat of the conviction under the second count because the grand jury could have ascertained that the instrument could have been known to the grand jury by which the killing occurred, then the evidence on the part of the grand jury as to their investigation along that line might be admissible, but there seems to have been nothing of that sort in this case. Upon another trial this character of testimony should not be permitted to go to the jury, unless an issue is raised calling for it.

Enough of the testimony has been mentioned to show that it is more than doubtful that the State has made out a case. The facts to the mind of the writer ought not to sustain this conviction. They are too indefinite, too uncertain, too vague and disconnected to justify a conviction for homicide, even discarding the theory that deceased may have thrown himself from the top of the oil tank. That deceased was not killed at the oil tank it would seem to be almost certain from the testimony. The State introduced in evidence the statement of the defend-

ant that he had not seen deceased after he left him at 2:20 o'clock on said night, and outside of the fact that appellant was with him at 2:20 o'clock, when they separated and deceased went away, any other man in Kerrville could have as well been charged with this homicide. There are too many particulars in evidence, and possibilities and probabilities from the facts for others to have committed this crime, if in fact it was a homicide, to say, under the rules of circumstantial evidence, that it excluded every reasonable conclusion except the guilt of the defendant. Two men were seen running away rapidly from the direction where the body of deceased was found; the disappearance of the burglars after this occurrence, the great number of strange Mexicans in the town, who had equal opportunities to kill the deceased; that he was not killed Saturday night, body was not at the oil tank on Sunday, and other facts render appellant's guilt too obscure, uncertain and improbable to authorize affirmance or conviction. There was no evidence that appellant had seen deceased after he left him at 2:20 o'clock, and this renders the facts in this case too uncertain in the opinion of the writer to authorize his conviction. The jury seemed to have entertained the same idea of uncertainty. Conceding the deceased came to his death at the hands of someone by violence inflicted upon the head, it was evidently done for the purpose of robbery; it was done at the dead hours of night. This would make the homicide an atrocious murder, yet the jury gave appellant only twenty-five years. They found upon the person of appellant no money or blood, and there was no sufficient evidence of his having killed or participated in the killing of deceased.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, PRESIDING JUDGE, and HARPER, JUDGE.—We concur in the reversal of the case, but do not think the evidence that prior to this time such residences had been burglarized at night-time was admissible. It tended to shed no light on who committed this murder, and the court did not err in excluding such testimony.

PRENDERGAST, PRESIDING JUDGE.—I am also of the opinion that the State's witness Leartie Butler, by the questions asked her by appellant's attorneys on cross-examination when the State examined her the second time, was a direct attack of her, charging that the testimony she gave this second time was from corrupt motives and fabricated between the time she first testified and this time. Such being the case, the State clearly could support her, and it was its duty to do so, by showing what she testified at the coroner's inquest, as the State did. Jones v. State, 38 Texas Crim. Rep., 87, pp. 103 and 115; English v. State, 34 Texas Crim. Rep., 190; Mitchell v. State, 36 Texas Crim. Rep., 278; Reddick v. State, 35 Texas Crim. Rep., 463; Akin v. State, 56 Texas Crim. Rep., 324; Fondren v. State, 74 Texas Crim. Rep., 552, 169 S. W. Rep., 411; Branch's Criminal Law, sec. 876.