## BOB JOHNSON v. THE STATE.

### No. 2985. Decided June 21, 1905.

**1.—Murder—Death Penalty—Confession—Issue for Jury.**

Where on trial for murder the confessions of the defendant, were probably admissible from the predicate laid by the State, yet were not so from the standpoint of defendant's testimony, the court should have submitted the issue to the jury in a proper charge as to which view they would take under the testimony bearing upon the predicate, and to disregard the confession if it was not voluntarily made; and a charge in a qualified way on this question was not sufficient, but the law should have been fully and pertinently submitted. .

**2.—Same—Confession—Threats—Promises—Duress and Force.**

On a trial for murder a charge applicable to the evidence should have been given to the effect that if defendant was still laboring under the influence of the threats, promises, duress and force made by any or all of the officers, or any other person in whose custody he may have been since his arrest, and there had not been a cessation of such influence at the time he made such confession, then such confession could not be considered.

**3.—Same—Murder in Second Degree—Charge. of Court—Accomplice—Manslaughter—Self-Defense.**

Where on a trial for murder there was evidence as to declarations by the defendant that he was cut by the deceased in the hand, etc., and that thereupon he grabbed a stick and hit him over the head and killed him, and also testimony of defendant's declaration, to the effect that a third party was engaged in the homicide and that defendant was an accessory thereto, etc., which evidence was placed before the jury by the States, the court should have submitted a charge on murder in the second degree and also one on accomplice's testimony. This testimony may further have suggested the theory of manslaughter and self-defense and the court, being required by the law to do so, should have submitted a charge upon every phase of the case.

**4.—Same—Evidence—Motive—Crime Committed by Another Party.**

Where on trial for murder defendant's theory was that another party committed the offense and not himself, and he placed on the witness stand the paramour of such other party, to show that she had received a considerable amount of currency from him and had exhibited it to one P.—the theory of the State being that deceased was killed for the purpose of taking his money— and she denied having a large roll of money on the night subsequent to the homicide, but admitted that she received five dollars from the said party, and thereupon the defendant placed said P. upon the stand to prove that she did receive a large roll of money from said party, to which the State objected. Held that this testimony should have been admitted as original evidence.

**5.—Same—Race Discrimination—Jury and Jury Law—Indictment—Venire.**

Where on a trial for murder the record showed that there were very few negro voters in the county of the trial, in comparison with the great number of voters; that the jury commissioners did not discriminate against these negroes in the selection of jurors; that they selected in every instance competent jurymen as they understood their duty, etc., there is no error in refusing to quash the indictment or the venire of petty jurors.

Appeal from the District Court of Erath.  Tried below before Hon. W. J. Oxford.

Appeal from a conviction of murder in the first degree; penalty, death.

The confession of the defendant to sheriff Creswell was partly as follows, and as testified to by said Creswell: "After I warned him we went on for a little piece and I asked him then why he killed Berry, and he told that he did not know why he done (did) it, that he could not tell why to save his life, and then I asked him how he done (did) it, and he commenced to tell me all about it: he said that him (he) and Berry was (were) up at Stamford and wanted to come down the road, both of them, and that they struck a brakeman on the Texas Central Railroad and asked him if he would bring them down on a freight train, and the brakeman told them to be around at the time the train pulled out and that he would bring them  *  *  * that they got into a box car and after the train had been out for quite a while the brakeman came back and asked them to dig up  *  *  * that defendant finally paid the brakeman $2.50 and only had a nickel left, and that deceased Berry gave the brakeman $1.75 and a pocket knife  *  *  *  Berry carried with him a grip in which he said he carried old clothes.  *  *  *  When they got down to Sisco they stopped awhile and switched around and I believe defendant said that another fellow got in the car at Sisco with him  *  *  *  that when they got to Dublin he and Berry got out of the car and went over to the Fort Worth and Rio Grande Depot, and from there to the wagon yard to get in the camp house and sleep, but that it was locked up and they could not get in and they walked up from there to the cotton seed oil mill; that they went up to the oil mill in the engine room and set the grip down and there was one or two parties in there, young fellows, and they set there and talked an hour or so  *  *  * and one of them asked the night oiler if he would let them sleep in the cotton seed, and he told them they could  *  *  *  and went with them up to the cotton seed and that they left the grip in the engine room and went through the door out into the seed room, and that they went up over the cotton-seed; it was quite a long building, and they went on out on top of the seed, and Berry dug out a hole in the seed behind a big column in the shade of the column, as there was an electric light in there  *  *  *  that he defendant began to dig himself a hole in the light where it was shining on the seed; he said that they both laid down in those holes, and that he lay there about an hour, and that Berry seemed to be asleep, and that he defendant woke up after

he had been in there awhile and saw that Berry was asleep, and he got up and went down and got a seed fork handle and went back up and he thought he, Berry, was asleep and that he hit him across the head, that he hit him three times across the forehead; he said: 'I hit him first and he kinder moved his muscles, and I hit him three more times and he never moved any more;' and he then went through his pockets and got $3 out of one of his pockets and then he went down into the engine room and got the grip that the boys were taking care of, and taking the grip went out down to the crossing of the railroad, and taking it out down the Texas Central about two or four miles, and about daylight he stopped and opened the grip and took out a suit of clothes that was in it and put it on and left the grip and the other stuff laying there, * * * that he went on in a fast walk down to the depot and got there just before the train came in * * * it was then after daylight and that he got on the back end of the passenger train * * * and went on to Hico * * * from there to Waco * * * and lay around there a day or so and got a telephone message from the oil mill man at Hico to come up and take a job of work * * * that he went to Hico to work on Thursday and worked two days and a half, etc.; he said that he heard about this boy being found at Dublin in the oil mill seed house * * * I think he said the night watchman in the oil mill spoke about it. * * * He said that he heard that they had suspicioned a yellow negro. * * * He said the night watchman said that if it was so and the negroes didn't mind and get out of here, that a negro in this country would not last as long as a snow ball would in hell, and he said that he got scared, he and another negro did and fixed up to leave, he said that he fixed up himself and went over about where the other negro was staying and pulled out of town and walked all night. * * * That he went out in the country in a day or two and went to work out about six or seven miles from Waco * * * when the officers came out there for him. * * *

"The negro also made the same statement almost exactly when in the jail here in town to myself and the district attorney. The district attorney did not lead him in making that statement, I think I told him to tell him what he had told me before on the road and he told us then in jail that he got the seed fork handle and killed Berry to get the money, the $150. * * *"

The defendant took the stand and testified pretty much the same as in his confession to the officer, except as to the details of the killing which is contained in the opinion of the court. He also testified that he made the confession under duress and promises from the officers, who told him that if he wanted to keep from being burned, etc., he might as well acknowledge the killing, etc.; that he first denied the killing of Berry but finally admitted it, etc. It was also shown by the State that the defendant wore the clothes of deceased which the latter had in his grip. The evidence in the case is very voluminous

but the above statement with that contained in the opinion of the court
will sufficiently elucidate the issues in the case.

*Ben Palmer, D. McAdams* and *B. E. Cook,* for appellant.—On question of confession: White's Code Crim. Proc., arts. 789, 790; Lauderdale v. State, 31 Texas Crim. Rep., 46; Lopez v. State, 12 Texas Crim. App., 27; Searcy v. State, 28 id., 513; Clayton v. State, 31 Texas Crim. Rep., 489; Paris v. State, 35 id., 82; Barnes v. State, 36 Texas, 356; Rice v. State, 22 Texas Crim. App., 654; Neeley v. State, 27 id., 324.

On question of admitting Felix Price's testimony to impeach that of Allie Crawford: Erwin v. State, 32 Texas Crim. Rep., 519; Storms v. State, 37 S. W. Rep., 439; Young v. State, 44 id., 835; Blake v. State, 38 Texas Crim. Rep., 377; Williford v. State, 36 id., 414; Kirk v. State, 35 id., 224; Dunagain v. State, 38 id., 614.

On question of impeaching defendant: Morales v. State, 36 Texas Crim. Rep., 234; Ware v. State, id., 597.

On question of charge of court, on law of confessions: Thomas v. State, 35 Texas Crim. Rep., 178; Gallaher v. State, 50 S. W. Rep., 388.

On question of charge on murder of second degree: Evers v. State, 31 Texas Crim. Rep., 318; Brown v. State, 4 Texas Crim. App., 275; Colbath v. State, 2 id., 391; Houston v. State, 26 id., 657; Sowell v. State, 32 Texas Crim. Rep., 482; James v. State, id., 509; Pollard v. State, 33 id., 197.

*Howard Martin,* Assistant Attorney-General, and *Fred H. Chandler,* District Attorney, for the State.

DAVIDSON, Presiding Judge.—This conviction was for murder, with the death penalty assessed. A brief history of the case will show that leaving Stamford, Jones County, appellant and deceased arrived at Dublin, Erath County, some time during the night. They came on a freight train, had some trouble in producing money and other effects sufficient to pay their way: deceased supplementing his money with a pocket knife. They went from the train at Dublin to an oil mill, where, after warming themselves, they were permitted to sleep in the seed house. During the night appellant left, and a few days afterwards the body of deceased was found covered up by the cotton-seed. This was about the 25th of November, and some time about the middle of December appellant was arrested in McLennan County, charged with the murder of deceased. The head of deceased appeared to have been struck by some blunt instrument two or three very severe blows, and near the body was found a stick which is described as being the handle of a shovel, about two feet long, with iron plating on one end of it, and adjusted as handles of this kind usually are at the other end with a contrivance or place to be held by the hand. Appellant, when arrested, was carried by the sheriff to Hamilton County, to Hico, thence

overland to Hamilton, thence to Stephenville, in Erath County. · While in jail at Hamilton, a confession was made to the sheriff and witness Main. Subsequently confessions were made to the sheriff of Erath County, and to the district attorney of that district. Considerable testimony was introduced as to whether these confessions were voluntary or produced by persuasion, threats and fear. The confession made to the district attorney was sought to be eliminated from the operation of any threat or reasons why objections should be urged to its introduction. There was also testimony introduced through the witness Hawkins of statements made by appellant on the train en route from · Waco to Hico. In regard to this statement, it is conceded there was no warning, but the introduction of this testimony is sought to be justified through the explanation of the court to the bill of exceptions, on the ground that appellant had taken the stand and testified to some matters in connection with the transaction for which he was under arrest, and this justified the State in having him detail all the conversation that occurred on the train. Without going into a detailed statement of the matters surrounding the confessions made to the two sheriffs and witness Main, it is somewhat doubtful as to whether they were brought within the rule of confessions voluntarily and freely made after being warned. Perhaps they were sufficiently within the provision of the statute, from the State's standpoint, to have permitted them to go to the jury. From the defendant's standpoint they were clearly inadmissible. Conceding that the confessions were admissible from the predicate laid by the State, yet they were not from the standpoint of defendant's testimony; and this required a charge from the court submitting the issue to the jury as to which view they would take under the testimony bearing upon the predicate, and if they should find that the confession was not voluntarily made to disregard it. The court in a qualified way gave a charge along this line. Appellant, however requested a charge submitting more fully and pertinently the law, which upon another trial should be given.

Appellant further requested the court, in regard to the confessions made to the district attorney, that if he was still laboring under the influence of the threats, promises, duress and force made by any or all of the officers, or any person in whose custody he may have been since his arrest, and there had not been a cessation of such influence at the time he made such confession, then such confession could not be regarded. While the charge itself does not mention the district attorney in connection with it, the charge was asked so as to cover that condition of the case, and in our judgment it should have been given. The case as to confessions is somewhat similar to that of Gallaher v. State, 40 Texas Crim. Rep., 296.

Exception was reserved because the law applicable to murder in the second degree was not given. We think this contention is well taken. Bearing upon this, the witness Thurman, was placed upon the stand by the State, and testified that he was the father-in-law of defendant

and saw him after he reached Waco, subsequent to his leaving Dublin, where the tragedy is said to have occurred. A conversation occurred between witness and defendant, in which among other things, he asked witness, if he had heard anything as he came through Dublin. "I went on talking with him for a little while, and in talking with him I noticed he had his hand tied up in a handkerchief, and I asked him what was the matter with his hand. He said, 'I got into a game in Dublin with two fellows, and one of them cut me in the hand, and the other kicked me in the side.' I asked him, 'what he did.' He says, 'I grabbed a stick and hit one of them over the head, and I think I killed the son-of-a-bitch.' We dropped the conversation then, and I went on about my work." Witness Hawkins testified, that he was a conductor on the train when appellant was carried from Waco to Hico, by the sheriff of Hamilton County. Omitting all previous portions of his testimony, he says: "I went and worked through the train, and some time later I came in and sat down there and I remember the officer told me that the negro was ready to tell something; that was the sheriff told me that, and the negro commenced. He said, there was five of us went in the seed house, at Dublin to gamble, and he started to mention some name, and I stopped him. I says, 'I don't want to be a witness in this case, I don't want to hear any name.' And he said, that while the game was in progress that Berry and a big man that was in the crowd got into a difficulty, and that Berry grabbed a seed fork handle and started to hit the big man with it. He called him the big man of the crowd. And the big man took it away from him and beat him over the head with it, and then finished him up with his 45, and then the big man told him (defendant) to get Berry's grip, and he (defendant) picked it up, and he (the big man) marched me with his 45 to my head through the engine room, and down the railroad to the crossing of the two roads, and he said, 'You go that way (and pointed down the Texas Central, east), and don't you ever look back or say nothing or I'll kill you,' and that he went out about three or four miles down the track and that he there opened the grip and took the clothes out of it."

Defendant testified in connection with this phase of the case, as follows: "Medford carried us to the door where just before going into the seed room we met Eugene Tyson, and he says, 'How is tricks kid?' and shook his hand and went on. He just says, 'How is tricks kid?' and then Medford shook his hand as he went by him. We were right at the door, three or four feet outside I suppose. And Medford took us on inside of the seed house and showed us where to dig a hole in behind the bank of seed so the wind would not strike us. Medford helped Berry to dig a hole right in behind a big column in there, and by that time I had mine dug, and was in it. I don't know how long I was in there. I had been asleep when I woke up and Tyson and Medford were standing by Berry, right over him, and tapping him on the foot with a seed fork handle. Just as Berry raised up I did too. And Tyson says, 'What about that game?' And he says, 'I don't want

to have any game. I want to sleep.' One of Berry's feet was sticking up a little. I got up and went outside, and I think I stayed out there about ten minutes, maybe not so long, and I came back and they were gone, and I went on back to the boiler room, and after that a while Tyson came into the boiler room, and he says, 'I skint him, but I had to knock hell out of him, and he has gone to have the whole push run in, and you had better hull out.' And I says, 'I haven't done anything to him that he would want to have me arrested for.' And he says, 'He will have you arrested for "vag."' He says, 'They are hell on having fellows pulled for "vag" down here. I understood that he meant by 'vag' that it meant laying around, loafing, and not having anything to do. He asked me there, if I had any money, and I told him that I didn't have but a nickel. And I told him it was awful cold to have to hot-foot it out of this place to-night. He said for me to go; he says, 'Go in there and get the damn son-of-a-bitch's grip;' he said, 'Go get it and hike out.' And he told me to go to Waco at once; and I told him that I didn't want to go that way. He says, 'If you go by Stephenville, you couldn't more than make it there by daylight, and they would telephone there and have you arrested.' He went with me to show me the way out." Under the testimony of Thurman and Hawkins the issue of murder in the second degree was unquestionably suggested. This evidence was placed before the jury by the State. The court recognizing the force of this testimony charged the jury. in regard to accomplice's testimony. The theory that Medford and Tyson were accomplices is suggested very largely by the testimony of these witnesses. While there may have been other testimony bearing upon this question, still these statements in part call for a charge on accomplice's testimony.

This testimony may further suggest the theory of manslaughter. However, the questions of manslaughter and self-defense were not urged in the court below, as we understand this record. We have so often decided that the court should submit a charge to the jury upon every phase of the case that we hardly deem it necessary to revert to that phase of the law again. Whenever testimony suggests a theory favorable to the accused, the court should submit the law applicable to that condition.

It is also urged that the testimony of Felix Price should have been admitted to impeach Allie Crawford. Allie Crawford, a negro woman, was the mistress of Eugene Tyson, and she and Tyson had been charged with and convicted of adultery. She was placed upon the stand by appellant, and testified that Eugene Tyson was in the habit of giving her money occasionally, perhaps two or three dollars every week. She denied having a large roll of money on the night subsequent to the homicide, but admitted he had given her $5. The theory of the State was that deceased was killed for the purpose of taking his money; and the further theory that he had $150 on his person. Appellant, supporting his theory that he did not kill deceased, but that Tyson and Medford did, offered to put this witness on the stand to prove,

if he could, that she had a considerable amount of currency and had exhibited it to Felix Price. She denied having the money. For the purpose of contradicting her, Price was offered as a witness, and his testimony rejected. It is insisted that he should have been permitted to impeach his own witness, Crawford, through the witness Price, showing that she did exhibit the money to him, and the circumstances under which she did. Upon another trial this testimony may become material as original testimony. If the woman had the money and had no means of obtaining it, in an honest and legitimate way, as she testified she had not, it would be a circumstance, in connection with all the other facts and circumstances to be proved by appellant by Price, as original testimony. Where a party is charged with crime, he can show as one of the means of meeting the State's case, that another party committed the offense and not himself. This has been the settled rule in Texas since the case of Dubose v. State, 10 Texas Crim. App., 230. The facts and circumstances were sufficiently cogent on the trial of this case, to cause the court to give a charge on accomplice testimony in regard to Medford and Tyson, and under all the evidence introduced along this line, it was shown that the witness Allie Crawford was not in a condition to have had more than a few dollars, as she herself testified she was a negro wash-woman, and the defendant was a day-laborer, employed in the oil mill at $1.35 per day. If Crawford had anything like a large amount of currency, it would be evident, under that state of affairs, that she came by it, in some illegitimate way; and as the facts appear, it would seem that Tyson would be placed in the attitude of coming into possession of it the same way. The intimate relations existing between them, the fact that he had been in the habit of giving her money every week,—perhaps these and other matters connected with the testimony might be a sufficient predicate to admit the testimony of Price to the effect that he saw her with this amount of money. Her statements, in connection with her possession of the money, would indicate that she got the money from Tyson. While the circumstances do not as closely connect themselves up as might be entirely satisfactory, yet these are circumstances which, in our judgment might call for the admission of Price's testimony, to the effect that she was seen in possession of the roll of currency.

The question of race discrimination is suggested as a reason why the judgment should be reversed, and the indictment quashed, as well as the error of the court in refusing to quash the venire of petit jurors. Without reviewing this phase of the case, we are of opinion that there was no error on the part of the court in refusing to quash the indictment. It is true, there is an antipathy to the negro race in that county, especially in some portions of it. There are very few negro voters in the county in comparison with the great number of voters: eighty-six out of perhaps forty-seven hundred or more. The jury commissioners testified that they did not discriminate against these negroes in the selection of jurors; that they selected in every instance competent

jurymen as they understood their duty, without discrimination against the few negroes sufficiently qualified to sit on the jury.

For the errors indicated, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*