STATE of Minnesota, Respondent,

v.

Ellsworth LeRoy HAWKINS,
Jr., Appellant.

No. 44779.

Supreme Court of Minnesota.

July 15, 1977.

Rehearing Denied Aug. 31, 1977.

C. Paul Jones, Public Defender, Ronald L. Haskvitz, Asst. Public Defender, Joseph S. Friedberg, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., William B. Randall, County Atty., Steven C. DeCoster, Asst. County Atty., St. Paul, for respondent.

Heard before TODD, MacLAUGHLIN, and YETKA, JJ., and reheard and decided by the court en banc.

YETKA, Justice.

This is an appeal from a judgment convicting appellant of first-degree murder, in violation of Minn. St. 609.185, subd. 1. The case was tried to a jury in Ramsey County, and appellant was sentenced to life imprisonment on June 29, 1973. On October 7, 1974, this court, upon motion of appellant's counsel, remanded the case for an evidentiary hearing under the 1967 post-conviction remedy act, Minn. St. c. 590. That hearing

was held on December 18, 1974, before the Ramsey County District Court. On May 16, 1975, that court issued an order denying the petition. We reverse the conviction and remand for a new trial on all issues.

The issues raised on this appeal are:

1. Whether in the interests of justice the defendant should be granted a new trial.

2. Whether the defendant was denied a fair trial because of the cumulative effect of some or all of 10 alleged prejudicial errors.

During the early morning hours of March 30, 1973, Jack Dokka was shot three times outside of his home at 935 Greenbrier, in St. Paul, Minnesota. Moments before he had just left his home with his friend John Czuchry. His body was found at the corner of the front porch by his wife, who had heard the shots. The appellant, Ellsworth LeRoy Hawkins, Jr., had been with the decedent earlier in the evening, was charged with the crime and subsequently convicted by a jury of first-degree murder, mainly on the testimony of Czuchry.

The events that culminated in the shooting of Dokka involve principally three persons, Dokka (the victim), Czuchry (the state's principal witness), and Hawkins (the defendant). All were drinking heavily over a period of several days. The alleged motive for the killing was that the victim and the defendant had a fight earlier in the evening outside the Ban Bar and that later in the evening the defendant sought the victim out and shot him twice in the head and once in the abdomen with a .38 caliber handgun.

The relevant events begin on March 29, 1973, shortly after midnight. After working his usual 4 p. m. to midnight shift at the 3M Company, Czuchry left work and went to the Bob Ross' Bar in St. Paul, where he met John Dokka. Czuchry and Dokka had known each other for about a year from their visiting the same bars on the East Side of St. Paul. It was the first time Czuchry had seen Dokka in 3 months.

After the bar closed, Dokka and Czuchry went to Czuchry's house in St. Paul to talk, play some chess, and drink. They stayed there until morning, when Czuchry gave Dokka a ride home. When they got to Dokka's house, they sat down and had a couple more beers. At around 7 or 7:30 a. m. Dokka's wife got up and left for work. To this point there is no dispute as to the facts.

That morning Dokka received a cut across his right eye for which he received several stitches at St. Paul Ramsey Hospital. Czuchry, who brought Dokka to the hospital, testified Dokka injured himself when he slipped while showing Czuchry his weights and how much he could lift. Czuchry also testified that he and Dokka picked up several more six packs of beer and went back over to Czuchry's house.

Czuchry then called the defendant Al Hawkins up, told him they were having a good time drinking, and asked him to come over. The defendant, who was 41 at the time of his arrest, lived in St. Paul. He had been married for 3 years, and had 1 child. At the time of the incident he had been employed as a machinist for the 3M Company for 5 years, and worked at the plant at 878 Russell in East St. Paul. The defendant and Czuchry had worked the 4 p. m. to midnight shift at the 3M plant for about the previous 8 months and would regularly drink together, along with other fellow workers, one to three times a week after work, at various bars including Bob Ross', Cusick's, and the Lamb's Club. The defendant described himself and Czuchry as friends. They frequented each other's homes, and would play chess together.

The defendant arrived at Czuchry's around 10:30 or 11 a. m. He had not previously met Dokka. The three talked, played chess, and engaged in some friendly arm wrestling. There were no hostilities during this time. At about 3:30 p. m., Czuchry had to go to work at 3M and asked the defendant if he would take Dokka home. They all left together; Czuchry went to 3M, Dokka and the defendant left in the defendant's car. From the time the defendant had ar-

rived to the time they left Czuchry's home (about 4½ hours) the three, among them, had consumed 2 six packs of beer and a quart and a half of hard liquor.

Instead of taking Dokka straight home, however, the defendant stopped at the Lamb's Club, a bar. While they were there Dokka fell over a table and broke some glasses, for which the defendant gave the bartender a dollar. The defendant had two drinks and Dokka had a beer.

At 5 p. m., at Dokka's suggestion, they went to the Ban Bar, a place where the defendant had not previously been. Dokka passed out, or slept, at the bar for about 2½ hours, while the defendant played some pool. Between 8 and 9 p. m. Dokka woke up. Because he didn't have any money with him when he started drinking, he had borrowed $5 from the owner. When he woke up, he bought two more rounds of drinks. The bartender testified that he was aware of no difficulties between Dokka and the defendant at that time.

Dokka then called his brother Gregory and asked him to bring money to pay back the owner. Gregory went to his brother's house and Dokka's wife wrote out a check for $5 and told Gregory to take it to the bar.

After finishing the drinks, the defendant, on the assumption that Dokka's brother would not be coming, left the bar with Dokka with the intention of taking him home. Outside the bar Dokka and the defendant met Ed Mattacavich, whom Dokka referred to as "uncle" and who asked about Dokka's mother.

Gregory Dokka arrived at this time after parking his car across the street. Upon hearing some whistling up the street, he saw the three men and approached them. Gregory knew Ed, and spoke with him for several minutes without paying attention to what Dokka and the defendant were talking about. After Ed left, Dokka introduced the defendant to Gregory, saying, "This big Negrillo is Al." Gregory wanted Dokka to come with him, and started to walk away, hoping Dokka would come with him, but he didn't. Gregory walked back to the pair and kept telling Dokka to come home. Dokka and the defendant were talking rowdy, but weren't arguing. Dokka finally started to come, but the defendant allegedly grabbed him by the lapels, and they fell into the street, where the defendant hit his head on the curb. Believing them to be fighting, Gregory ran up to the defendant and kicked at him. Dokka and the defendant then got up and started to talk over who flipped the other. Dokka said he felt bad about what happened and offered to buy the defendant a beer, to which the defendant responded that he had to go to his car first. The three went over to the defendant's car, where defendant got a walking stick out of his trunk. (The defendant had hurt his back in an auto accident 1 year before and had the cane prescribed as part of the treatment.) While they were standing by the car, Gregory needed a light for a cigarette and the defendant let him use the cigarette lighter in his car. The defendant then said, "Let's go have a beer," and the three walked back into the bar.

Dokka and the defendant went into the washroom together and cleaned up. When they came out, Gregory was talking to Jerry Parks, a high school friend of both his and Dokka.

Gregory's testimony on what happened next is as follows:

"Oh. When they were in the bathroom washing up, Parks was standing over there talking to me and Phil was shooting pool, and Jack came out and sat down, Hawkins followed, and Jack said to Parks, laughingly, he said, 'This dude said he is going to kill me.' And Parks said, 'So what?', you know. You know, he said, 'This dude wants to kill me.' And Parks said, 'So what? So do I', and, you know, chuckled, you know."

The parties then had another beer, and Gregory gave the $5 check to Dokka, who then gave it to the bartender. The defendant asked Dokka for his name and address (the defendant testified it was for the $2.50 he owed Dokka for his share of the drinks). After receiving the slip of paper with Dok-

ka's address on it, the defendant "chuckled," and remarked "What's that say?" The bartender testified Dokka had given his name and address to several people that night because he was looking for a job. Defendant also asked for Gregory's address, who refused to give it to him. The defendant then said, "I'll be seeing you" to Dokka, and "I'll be seeing you, too" to Gregory, and left the bar alone.

The defendant testified he then went briefly to Triviski's bar and the Celebrity Lounge on Selby Avenue, and then to Bob Ross', where he talked to several friends and asked about Czuchry.

The defendant returned to the Ban Bar (where the fight allegedly took place) between 11:30 and midnight, and asked the bartender where the "boys" (meaning Dokka and his brother Gregory) were and where Dokka lived. One patron (a friend of Dokka's) testified he saw a bulge under the defendant's shirt. The bartender, however, testified he did not notice any bulge in the defendant's shirt. The defendant then left the bar.

The bartender told one of the patrons to dial Dokka's number. The bartender asked for Dokka and after his wife said he was sleeping, testified that he said, "Well, if he does wake up tell him that the fellow that he was in the bar with came back looking for him." She phoned Gregory, who told her to call the police. The police arrived at 1 a.m. Dokka was asleep and did not talk to the police. The police report states that Mrs. Dokka said her husband had been in a fight with "two colored men." Officer Lind testified that Mrs. Dokka told him that the bartender had called and stated that a man had threatened the life of her husband. The bartender denied telling her that Dokka's life was in danger or any other statement of that variety, but only that he was in effect merely relaying a message and that Mrs. Dokka did not seem upset upon hearing the message. The police officer testified that he told Mrs. Dokka that if anyone "appeared to come to the house to call us immediately." The police then went by the house several times in the next half hour or 45 minutes.

The defendant, meantime, had gone to Cusick's Bar where he had 3 or 4 more drinks, and played pool until closing time with two friends from 3M, Roy Sundstrom and Raymond Wegleitner. The defendant asked Wegleitner if he could borrow 5 or 10 dollars, and Sundstrom gave him 2 dollars. The defendant asked them to go with him, but did not tell them where he wanted to go. After the bar closed, the defendant followed them north on Payne Avenue for a distance.

While all this was taking place, Czuchry had gone to 3M to work his 4 p. m. to midnight shift. He managed to get a couple of hours sleep during work and went to Bob Ross' Bar at midnight. Czuchry testified he was told by the bartenders that the defendant had been in a fight and was looking for Dokka (the bartenders, however, testified the defendant had been looking for Czuchry and was in a jovial mood). Czuchry stayed at the bar until closing, then tried unsuccessfully to find Dokka's house, and went home.

The first thing Czuchry did when he got home was to call the defendant's wife and ask if Al was "okay." The defendant's wife testified that Czuchry also said that if "the guy [Dokka] had done anything to Al—and that Al was his friend and the guy was kind of dingy anyway—and that he [Czuchry] would do something to him [Dokka] or he would get him [Dokka]." Czuchry denies this.

Mrs. Dokka then testified that about 1:30 or 2 a. m. she was awakened by a loud banging on the front door and saw a square-shouldered, straight-postured black male with short Afro-style hair standing at the door. She then testified that this person drove down the street with his horn honking. She then went back to sleep without reporting this to the police. At a lineup the following day, she identified the defendant as this individual.

Around 2 a. m. the defendant arrived at Czuchry's house. Czuchry testified the defendant said that Czuchry's friends had kicked him, beat him up, and threw him out

of a car, and wanted Czuchry to help him find Dokka. The defendant, on the other hand, testified he told Czuchry he "fell on the curb."

Czuchry then made two calls to Dokka's, but was told by Mrs. Dokka that her husband was asleep and to call in the morning.

At this point the stories of Czuchry and the defendant diverge. The defendant testified that he fell asleep on Czuchry's couch, that Czuchry woke him up later and took him home because he was too drunk to drive, and that he didn't remember anything until he woke up. Czuchry, on the other hand, testified that at this point the defendant called Dokka and that he (Czuchry) picked up the extension, and invited Dokka over to play chess and to talk. Dokka agreed. According to Czuchry, he and the defendant drove to Dokka's in Czuchry's car.

Mrs. Dokka testified that she heard a knock on the door, whereupon she and her husband turned on the hall light and saw that it was Czuchry. Dokka opened the door, and Czuchry asked to use the bathroom. Mrs. Dokka then observed Czuchry and Dokka go out the door. The last thing she saw was Czuchry by the taillight on the street side of his car, and Dokka on the side of the car nearest the house. She then turned around, took about three steps into the living room, and heard three shots. Earl Deyo, who was next door to Dokka's home that morning, testified that he heard the shots at 4:20 a. m.

Czuchry testified he heard the shots just as he was getting into the driver's seat of the car, and turned to see the defendant with a long-barreled revolver in his hand. Czuchry then testified the defendant said, "I tried to hit him in the head," to which he replied, "[Y]ou crazy bastard."

According to Czuchry, defendant directed him to take the Marion Street exit to the Cunningham's residence. When they arrived at Cunningham's, defendant tapped or whistled and a woman opened the door. Defendant took a gun out of his belt, handing it to the woman; he kissed her on the cheek, and said "thank you." Czuchry identified this woman as Mrs. Cunningham.

Czuchry then testified that they then proceeded to Paul Clark's house, taking some beers out of the car as they entered the house. Czuchry testified that while they were sitting around talking, defendant stated a few times, "You want to tell them about it, go ahead and tell them about it." Then he kind of laughed. Defendant then asked Czuchry to take him home. Upon arriving home, Czuchry called defendant to tell him that his car was gone. Sometime thereafter the police came to the door and Czuchry noticed that defendant was with them.

A significantly different version of the morning was testified to by defendant, Mr. and Mrs. Cunningham, and Paul Clark.

Defendant testified that when he got to Czuchry's home early on the morning of the 30th he had a couple of drinks and then went to sleep on Czuchry's couch. Sometime later Czuchry woke him up and asked him if he wanted to be taken home. As they were nearing the Marion Street exit defendant became sick and asked Czuchry to take the exit. Defendant got out of the car and vomited. They then drove to Paul Clark's house so that defendant could wash up before going home.

Paul Clark estimated that defendant and Czuchry came to his home that morning between 4:30 and 4:45 and stayed for about 45 minutes. He recalled no statement by defendant to Czuchry "go ahead and tell him." The three men engaged in "friendly conversation," and Czuchry thanked Clark for a birthday card which he had sent him. According to defendant, Czuchry then drove him home. Defendant went in, kissed his wife, and went to sleep.

Mrs. Hawkins testified that Czuchry and her husband entered the house and they both went to sleep. She then left for work at 6:30 a. m.

At about 10 a. m. the morning of March 30, Mr. Cunningham came over to fix defendant's car. Because the car was left at Czuchry's, Cunningham and defendant drove over to pick it up. When they ar-

rived at Czuchry's home, defendant saw detectives, whom he assumed were there because of his "stolen car." He approached the policemen, asked about his car, and was placed under arrest for murder.

Both Mr. and Mrs. Cunningham denied that defendant came to their home that morning as claimed by Czuchry. Mrs. Cunningham's testimony was given as a witness for the state.

Mrs. Dokka testified that after she had heard the shots, she called the police and then Gregory, her brother-in-law. She went out and found her husband's body laying face up at the side of the house, and covered it with a blanket.

The same police officers who had responded to Mrs. Dokka's call earlier in the evening arrived at 4:30 a. m. While one took a statement from Mrs. Dokka, the other radioed for assistance and accompanied Dokka to St. Paul-Ramsey Hospital, where he was pronounced dead. Meanwhile, Gregory arrived with a shotgun in his hand, which one of the officers took away from him to forestall his threats of vengeance on "the nigger."

The police report indicates Mrs. Dokka told the police that "John," a friend of her husband's, had called for her husband and that "they had been drinking for the past three days." She showed the police Czuchry's name, address, and phone number in an address book and a squad car was dispatched to Czuchry's house.

When the police reached Czuchry's home, they found no one at home but saw a black over white 4-door hardtop 1967 Chevrolet in the driveway (the defendant's car). Several pictures were taken of the interior of the car. The car was towed to the St. Paul Police garage. A search pursuant to a warrant turned up 2 one-dollar bills, a glass tumbler, and a handwritten note containing Dokka's name and address.

At between 10 and 11 a.m. that morning, the police returned to the Czuchry house and immediately thereafter the defendant and Cunningham (the mechanic who was to fix the defendant's car) pulled up. The defendant came up to the officers and after they asked, "who are you?", identified himself. The officers arrested the defendant.

Defendant was interrogated by police the same day of his arrest. During this interrogation, defendant requested the performance of a test on his hands to determine whether he had fired a gun. Those tests were not performed.

An autopsy showed that Dokka suffered three wounds, two in the head, one in the abdomen, from close range (1 to 8 feet). Examination of the abdominal slug showed it was of about .38 caliber. Based on the rifling (barrel grooves which give spin to the bullet), it had been fired from a .38 Iver Johnson or a .38 or .357 Smith and Wesson revolver.

The defendant had purchased a .38 caliber Smith and Wesson revolver 3 years previously, but, according to Cisto Munoz and Dorothy Gutierrez, he had traded it to that couple for a portable TV set in May of 1970.

On April 24, 1973, the Ramsey County grand jury returned an indictment against the defendant for first-degree murder.

The defendant retained counsel to represent him. Defendant's counsel attempted to arrange for a lie detector test for both the defendant and Czuchry as part of an agreement with the prosecutor that if the defendant passed the test, consideration would be given to having Czuchry examined. The defendant's test was inconclusive.

Prior to trial, plea negotiations took place. A charge of third degree murder was offered to the defendant. His attorney recommended the defendant accept. The defendant rejected the plea offer.

At the ensuing trial before a jury the defense argued, first, that Czuchry had committed the crime, second, that the defendant's intoxication reduced or negated the specific criminal intent to commit the crime charged.

The jury was instructed on first-degree murder and the lesser included crimes of second- and third-degree murder. The de-

fense requested a manslaughter instruction, which the trial court denied. After deliberation, the jury found the defendant guilty of first-degree murder.

### 1. Sufficiency of the Evidence.

■ The usual standard of review for criminal matters is stated in *State v. Thompson*, 273 Minn. 1, 36, 139 N.W.2d 490, 515, certiorari denied, 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966):

" * * * On appeal we are governed ·by the same rules as in any other case. In *State v. Norgaard*, 272 Minn. 48, 52, 136 N.W.2d 628, 631, we said:

'In passing upon the weight and sufficiency of the evidence we can only repeat that the scope of our review is limited to ascertaining whether under the evidence contained in the record the jury could reasonably find the accused guilty of the offense charged. If the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that defendant was proven guilty of the offense charged, a reviewing court will not disturb its verdict.' See, also, *State v. Markuson*, 261 Minn. 515, 113 N.W.2d 346.

"We are also governed by the rule that on appeal this court must take the evidence most favorable to the state and must assume that the jury believed the state's witnesses and disbelieved anything which contradicted their testimony. *State v. Homme*, 226 Minn. 83, 32 N.W.2d 151; *State v. Schabert*, 222 Minn. 261, 24 N.W.2d 846, 31 Minn.L.Rev. 375."

If this standard alone is strictly followed, there would be little choice but to affirm. However, it is on the other issues, namely, the denial of due process and fair trial that we feel reversal is dictated.

### 2. Denial of Due Process of Law and Fair Trial.

■ Numerous errors appear in the trial and there appear glaring delinquencies in the presentation by counsel for the defendant. No single error alone would require reversal, but the cumulative effect of numerous errors and other factors, which we will discuss further, denied defendant a fair trial. For example, both the defense counsel and the prosecutor were allowed additional closing arguments, giving the prosecution as a result the closing argument to the jury. Minn. St. 631.07 states:

"When the evidence shall be concluded upon the trial of any indictment, unless the cause shall be submitted on either or both sides without argument, the plaintiff shall commence and *the defendant conclude* the argument to the jury." (Italics supplied.)

The most serious error, however, appears to have been committed when the trial court refused to allow the defense to introduce evidence of past instances of heavy drinking and violence on the part of Czuchry as impeachment.

Counsel inquired during cross-examination of Czuchry whether his memory was generally affected by drinking, and whether he became hostile and aggressive when drinking. Objections to these questions were sustained. Counsel then made an offer of proof, setting forth numerous specific episodes that would reflect on Czuchry's credibility by showing that he reacted with hostility during similar drinking episodes. Subsequently an offer of proof was made by counsel that cross-examination of Czuchry would show that heavy drinking affected his ability to recollect facts; that he would have blackouts and engage in conduct that he could not later recall; that he would become physically violent. Counsel also suggested that certain persons were available to testify to such matters. Defendant also attempted to testify on direct that he overheard Dokka and Czuchry talking about stolen guns that one of them had. At the post-conviction hearing counsel testified that he was prepared to call witnesses to testify to episodes of violence by Czuchry; drinking episodes, resulting in "relatively abnormal" behavior by Czuchry; fits of violence by Czuchry; blackouts; and that he had pulled a gun on his wife.

The court ruled that the witnesses could not be called to testify concerning Czuchry's conduct during these episodes, and that Czuchry could not be cross-examined on those matters. The postconviction court concluded that collateral acts of violence could not be shown. The trial court based its ruling on the standard rule that a witness who takes the stand does not place his character in issue, e. g., *State v. Gress*, 250 Minn. 337, 84 N.W.2d 616 (1957). The problem with the trial court's ruling is the central position of Czuchry in this case. His testimony is essentially all that convicted the defendant. Any allowable room for the testing of his credibility should be used.

█ The present case is unlike the usual instance in which a witness is called. Here, Czuchry's character was put into issue because one of the defenses offered by the defendant's attorney was that Czuchry himself had committed the murder. In the usual witness situation that point is never raised, much less considered. In this case, however, it serves as a central point of the defense and is not a collateral issue.

█ The evidence the defendant sought to introduce about Czuchry falls into two general areas. The first is evidence which would tend to indicate that drinking adversely affected Czuchry's ability to perceive and remember the events on the night of the killing. The state of intoxication of Czuchry at the time of Dokka's killing is certainly admissible. This court stated in *Olstad v. Fahse*, 204 Minn. 118, 121, 282 N.W. 694, 696 (1938):

> " * * * That a witness at the time of the occurrences which he relates was under the influence of liquor is competent to show the impairment of his powers of observation and the likelihood of impaired recollection."

Accord, *Kedrowski v. Czech*, 244 Minn. 111, 69 N.W.2d 337 (1955); 3A Wigmore, Evidence (Chadbourn rev.) § 933; 81 Am. Jur.2d, Witnesses, § 544; 98 C.J.S. Witnesses § 461h, pp. 328–329. In addition, however, the defendant sought to introduce evidence of Czuchry's intoxication on prior occasions. General intemperance is inadmissible if its influence is not present at the time of perception. Cf., *State v. King*, 88 Minn. 175, 92 N.W. 965 (1903) (opium). In this instance, however, the prior incidents of drinking are relevant to the capacity of the witness to perceive or remember the crucial events to which he testified insofar as they indicate the probability of a defect in his ability to observe or recall events at that time. Thus, a history of blackouts during periods of intoxication similar to those on the night of the murder is relevant.

The other items of proof offered by the defendant pose a more difficult problem. An attempt was made to show that Czuchry and Dokka had, on occasion, talked about stolen guns that one of them had, and also that Czuchry would become physically violent when intoxicated.

█ The tendency of the decisions is to relax the rule against admission of collateral matters tending to support the defendant's plea, such as malice, motive, opportunity, and threats of third persons toward the deceased in a homicide case. E. g., *Hart v. State*, 15 Tex.App. 202, 234 (1883). See, generally, 1 Wigmore, Evidence (3 ed.) §§ 139 to 142; 40 C.J.S. Homicide §§ 218 to 220; 40 Am.Jur.2d, Homicide, § 296; Annotation, 121 A.L.R. 1362. See, also, *State v. Bock*, 229 Minn. 449, 39 N.W.2d 887 (1949); *State v. Staveneau*, 158 Minn. 329, 197 N.W. 667 (1924). Moreover, where the third person is a state's witness with a possible motive to convict the defendant to save himself, the rule admitting otherwise competent evidence of a third person's guilt is especially applicable. *Hart v. State, supra*; *Dubose v. State*, 10 Tex.App. 230 (1881). Thus, where the issue is whether in fact the defendant killed the deceased, evidence tending to prove that another person did the killing is admissible.[1] The purpose of evidence to show that another committed the homicide is not to prove the guilt of the other person, but to generate a reasonable

---

1. Where the defendant admitted the killing but pled self-defense (see, *Mims v. Commonwealth*, 236 Ky. 186, 32 S.E.2d 986 [1930]), the rule does not apply.

doubt of the guilt of the defendant. E. g., *State v. Perelli*, 125 Conn. 321, 328, 5 A.2d 705, 708 (1939); *State v. Cremeans*, 62 W.Va. 134, 142, 57 S.E. 405, 408 (1907). Proper foundation must be laid for the admission of such evidence, however, to avoid the consideration of matters collateral to the crime. "The rule is that [evidence of such acts] by a third person against the victim may not be shown unless coupled with other evidence having an inherent tendency to connect such other person with the actual commission of the crime." *Marrone v. State*, 359 P.2d 969, 984 (Alaska 1961). Accord, *State v. Lilja*, 155 Minn. 251, 256, 193 N.W. 178, 180 (1923); Annotation, 121 A.L.R. 1362, 1363. That is, evidence tending to incriminate another is inadmissible in the absence of proof of facts to connect that person with the crime. This requirement avoids the use of bare suspicion and safeguards the third person from indiscriminate use of past differences with the deceased.

Once the necessary foundation is proven, it is permissible to introduce evidence of a motive of the third person to commit the crime,[2] threats by the third person,[3] or other miscellaneous facts which would tend to prove the third person committed the act.[4] For example, in *Dubose v. State*, 10 Tex.App. 230 (1881), a trial for murder in which the identification of the defendant as the murderer was at issue, the state introduced the testimony of a witness against whom there was some proof of complicity. The defendant offered to prove that the witness was at enmity with the victim, had threatened his life, and carried a weapon, but the trial court rejected the offer of proof. On appeal, the exclusion of the evidence was held to be error because it proximately tended to exculpate the defendant. Also, in *Hart v. State*, 15 Tex. App. 202 (1883), the court held the exclusion of such evidence to be error, stating (15 Tex.App. 235):

"Now in the case before us, if the witness had a motive to kill [the victim], and had threatened to kill him, and he believed that on account of these threats [the defendant's] friends were endeavoring to saddle the murder upon him, and thereby relieve [the defendant]; and he believed further that the struggle as to who had committed the deed would be between himself and [the defendant], it would certainly furnish a strong motive on his part to try and secure [the defendant's] conviction; and the extent and character of that motive towards [the defendant] was legitimate and admissible to be considered by the jury in estimating his credibility, in the light of the circumstances engendering the motive. We are of opinion the court committed an error in excluding this evidence."

Such evidence is not, technically speaking, impeachment evidence. Where it is the theory of the defense that the crime was committed by a witness for the state, who testified that he was present when the defendant committed the crime, evidence of statements made by the witness out of court conflicting with his testimony is admissible as original evidence on behalf of the defense. *Harrison v. State*, 47 Tex. Cr.R. 393, 83 S.W. 699 (1904).[5] The state, of

2.  1 Wigmore, Evidence (3 ed.) § 141; 40 C.J.S. Homicide § 219; Annotation, 121 A.L.R. 1362, 1367. For example, it has been held admissible to prove motive of another where it consisted *inter alia* of obtaining money (*Johnson v. State*, 48 Tex.Cr.R. 423, 88 S.W. 223 [1905]), hostility towards the deceased (*Green v. State*, 154 Tenn. 26, 285 S.W. 554 [1926]), or a quarrel with the deceased (*Crawford v. State*, 12 Ga. 142 [1852]).

3.  1 Wigmore, Evidence (3 ed.) § 140; 40 C.J.S. Homicide § 220.

4.  1 Wigmore, Evidence (3 ed.) § 142. For example, where there is some evidence to connect another with the homicide, evidence of his having a weapon in his possession is admissible. E. g., *Jackson v. State*, 67 S.W. 497 (Tex.Cr. App.1902) (third person seen running from scene of homicide with knife in hand).

5.  See, also, *Ex parte Gilstrap*, 14 Tex.Cr.R. 240 (1883) (where the defendant was charged with murder and most of the criminative facts were established by a witness for the state, the defense, without laying a predicate for the impeachment of the witness, could prove that the witness had a weapon, had a motive to do the act, and had made threats to the victim).

course, may rebut such evidence. See, 40 C.J.S. Homicide § 218, p. 1131.

■ In the present case, it thus was error for the trial court to exclude evidence which would tend to prove that the crime was done by Czuchry. The testimony of Czuchry himself connected him to the crime. This satisfied the requisite foundation for connecting the third person to the crime. The evidence of possible past illegal dealings between Czuchry and the victim, or similar events, could provide a motive and should have been admitted. The collateral acts of violence by Czuchry could be relevant to whether he committed the crime.

The testimony of Czuchry was crucial to the conviction of the defendant. Moreover, Czuchry himself was a suspect at the early stages of the investigation. By not allowing the defense to question Czuchry about prior blackouts while drinking, the key witness upon whom the state's case rested was not exposed to the truth-revealing pressures of the sort of cross-examination which is the heart of our adversary system. Also, by not allowing the defense to introduce evidence relevant to the possible commission of the crime by the principal witness of the state, the defense was deprived of evidence which, on the facts of this case, was crucial to the maintenance of a proper defense.

The other assignments of error are either not error or are harmless error.

Therefore, because of the errors made by the trial court, we believe that the defendant was denied a fair trial and must be awarded a new trial.

Reversed and remanded for a new trial on all issues.