**STATE of Minnesota, Respondent,**

v.

**Rosetta BELLAPHANT, Appellant.**

**No. C4–94–2232.**

Court of Appeals of Minnesota.

Aug. 8, 1995.

Review Denied Sept. 28, 1995.

Hubert H. Humphrey, III, Atty. Gen., Susan Gaertner, Ramsey County Atty., Beth Gessner Sullivan, Asst. County Atty., St. Paul, for respondent.

John M. Stuart, State Public Defender, Sharon E. Jacks, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by KLAPHAKE, P.J., and HUSPENI and NORTON, JJ.

## OPINION

NORTON, Judge.

Appellant challenges her conviction for second degree murder after the shaking death of her child, alleging that the evidence was insufficient to support the guilty verdict and that the trial court improperly excluded evidence that would have inculpated another person in the crime. The trial court deprived appellant of a fair trial by excluding that evidence when it would have supported her theory of the defense. We reverse and remand for a new trial.

## FACTS

Appellant Rosetta Minette Bellaphant was convicted for the second degree murder of her three-month-old son, Denzel, who died as a result of shaken baby syndrome.

Born on August 31, 1993, Denzel started his life in the neonatal intensive care unit because he was born 3–½ months prematurely and suffered from several health problems. When the doctor discharged Denzel from the hospital on November 13, 1993, he believed Denzel was in a "remarkably good," healthy condition. Denzel no longer required any form of life support or medication.

Appellant had participated in a training program for parents of premature babies before she brought Denzel home to live with her and her 18–month–old son, Devin. She took Denzel to weekly doctor appointments where, at his last checkup on December 14, 1993, the doctor gave Denzel a full exam, including vaccinations, and was "really pleased" with Denzel's progress.

On December 17, appellant noticed that Denzel had stopped breathing after his morning feeding. She initially thought that he was having a "spell" which he had frequently had in the hospital. When her attempts to resuscitate him were unsuccessful, she called 911. When the paramedics brought Denzel to the hospital, he was in a coma, and the soft spot on his head was bulging, indicating intracranial pressure. He also had red bruises on both shoulders. He was placed in pediatric intensive care.

By late evening December 19, Denzel's death was imminent. In the early morning hours of December 20, the family decided to disconnect life support. Denzel died.

The final diagnosis of Denzel's condition was that he suffered severe head trauma; the blood vessels between his brain and the surrounding membranes had been sheared,

causing a subdural hemorrhage. This injury caused cerebral edema, a swelling of the brain. He also suffered from severe retinal hemorrhage. The autopsy also revealed that Denzel's brain had "contusional clefts," which are lacerations in the brain tissue that result from the impact of the brain with the skull. Denzel also had a fracture in his left upper arm, his right upper arm, and in his left and right clavicle. All of the doctors who treated Denzel and all of the medical experts who testified at trial concurred that Denzel died of shaken baby syndrome.

Because appellant was Denzel's primary custodian, authorities suspected her of causing his death. Initially, appellant denied ever intentionally shaking Denzel. In a custodial interview, however, after an officer described the type of shaking that could have harmed Denzel, appellant admitted that the shaking "could have happened." Appellant described how Denzel cried often and, for the two days prior to this incident, he had been inconsolable in spite of her efforts to comfort him. She explained that she was unclear how she treated Denzel early in the morning of December 17 because she had been half asleep when she consoled him. She said,

> I can't say it [the shaking] couldn't happen because it could. If I was asleep, it could happen. If I was awake, it could happen.

This exchange occurred toward the end of the interview:

> [Officer]: I was thinking maybe when you were half asleep, you [shook Denzel] more vigorously. That is one of the things you can't remember.
>
> [Appellant]: Probably. Like I said, if you are asleep, you just, even if you are awoke, you just be trying to get him to the swing just to make him shut up and, you know, they're hollering. You turn your T.V. up and they will go right to sleep. They will holler theirself to sleep.
>
> [Officer]: Well, you think that is what happened?
>
> [Appellant]: Yeah, it must have been what happened.

The state played the tape of this interview at trial. In addition to appellant's direct statements, the jury heard medical evidence regarding the nature, probable cause, and effect of Denzel's injuries. Based upon this evidence, the jury found appellant guilty as charged of second degree murder. Minn. Stat. § 609.19(2) (1992) (an unintentional killing while committing a felony offense); *see also* Minn.Stat. § 609.377 (1992) (malicious punishment of a child).

## ISSUE

Did the trial court deny appellant's constitutional right to a fair trial by excluding certain evidence that may have raised a reasonable doubt of appellant's guilt by inculpating another person?

## ANALYSIS

■■ An appellate court "reviews questions concerning the admissibility of evidence on abuse-of-discretion basis." *State v. Gustafson*, 379 N.W.2d 81, 84 (Minn.1985). Appellant contends she was denied a fair trial because the trial court excluded evidence inculpating Anthony Cleaves in this murder. We agree.

■■ Evidence of other crimes, wrongs, or acts is admissible when the conduct of a third party is at issue and the evidence of other crimes, wrongs, or acts

> is not offered to prove the third party's character as a basis for an inference as to his conduct but instead is offered to prove the conduct of the third party without any need to infer his character.

*State v. Deans*, 356 N.W.2d 674, 676 (Minn. 1984); *see also* Minn.R.Evid. 404(b) (evidence of person's other crimes, wrongs or acts are inadmissible if offered "to prove character of a person in order to show action in conformity therewith," but may be admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident").

■■ Furthermore, when a defendant implicates a third party in a murder and calls that person's character into question, the third party's character becomes a central point of the defense and is not a collateral issue so long as the defense lays proper foundation for the evidence. *State v. Hawkins*, 260 N.W.2d 150, 158–59 (Minn.1977).

[W]here the issue is whether in fact the defendant killed the deceased, evidence tending to prove that another person did the killing is admissible. The purpose of evidence to show that another committed the homicide is not to prove the guilt of the other person, but to generate a reasonable doubt of the guilt of the defendant.

*Id.* (footnote omitted). That evidence must include facts that connect the third person with the crime. *Id.* at 159 (foundation requirement protects third person by avoiding use of "bare suspicion"). Once the defense has laid this necessary foundation, it may introduce evidence of the third person's motive to commit the crime, any threats the third person made, or "other miscellaneous facts which would tend to prove the third person committed the act." *Id.* (footnote omitted).

Appellant sought to admit evidence that would have inculpated Anthony Cleaves, Devin's father. The state included Cleaves on its witness list, but he invoked protection of the fifth amendment and did not testify.[1]

Cleaves lived with his girlfriend in appellant's apartment building. He had stopped by appellant's apartment on the morning of December 16 to take Devin to a birthday party. Appellant left him alone with the sleeping children for approximately four minutes. When she returned, both children were awake and crying. Cleaves stopped over again in the early morning hours of December 17 to use the telephone. Appellant left him alone with the sleeping children for fifteen minutes while she took out the garbage; when she returned, the children were again awake and crying.

The trial court allowed appellant to testify about Cleaves' demeanor and behavior on these two occasions. She said he was angry with her because he felt she treated Denzel better than his son, Devin. She said Cleaves was "really mad" and very argumentative when he came to pick Devin up in the morning. She heard Cleaves tell Devin to kick

Denzel whenever he had the chance. Cleaves woke appellant later that night by pounding on her apartment door. The trial court also allowed Cleaves' girlfriend to testify about Cleaves' demeanor and behavior on December 16 and 17.

In addition to this testimony, appellant sought to admit evidence that Cleaves had attempted to hire someone to beat her up while she was pregnant with Denzel, and that Cleaves' girlfriend got an order for protection against Cleaves on December 16, the same evening that Cleaves had visited appellant and had been alone with the children. Appellant sought to introduce this evidence to support her testimony that Cleaves was angry with her for having borne another child with another man, that Cleaves had harsh feelings for the child, and that Cleaves was in a violent and upset state when he visited her on December 16. Most importantly, appellant sought to introduce this evidence to show that Cleaves had the motive and opportunity to shake and hurt Denzel.

Appellant had set forth sufficient foundation to admit this evidence. She established that Cleaves visited her twice within the time the doctors hypothesized that Denzel was shaken and injured. She testified to Cleaves' negative demeanor, that Cleaves was alone with the boys briefly during his two visits, and that both children were crying after being alone with him. These facts placed Cleaves alone with Denzel at a critical time in this case and raised an issue of his motive to hurt Denzel. *See Hawkins,* 260 N.W.2d at 159 (evidence inculpating third party will be admissible only when foundational facts connect third party with crime).

The trial court excluded these two pieces of evidence, stating:

I believe that these things are—those events are not relevant to the issue which must be tried here, and that is: Whether or not [appellant] is guilty of murder in the 2nd degree, having used unreasonable

1. The court may apply the *Hawkins* analysis to cases involving non-witness third parties, such as Cleaves, as well as the typical cases discussed earlier. *See State v. Higgins,* 422 N.W.2d 277, 280–81 (Minn.App.1988) (court applied same analysis when determining defendant's request to admit evidence to implicate a third party who had testified and a third party who had not testified).

force against her child and causing his death.

Such a decision was an abuse of discretion. Appellant offered this evidence to corroborate her version of the facts and to support her theory of defense, to wit: Cleaves had the motive, intent, and opportunity to harm Denzel. Contrary to the trial court's decision, these pieces of evidence are integrally related to the weight of corroborative evidence that appellant could present to raise a reasonable doubt about her guilt. *See Hawkins*, 260 N.W.2d at 158–59 (purpose of evidence inculpating third party is to generate reasonable doubt about defendant's guilt). Defense counsel had witnesses prepared to testify to the two excluded pieces of evidence. Without that evidence, the record contains only appellant's accounts of Cleaves' visits to her apartment, but lacks any corroboration.

■ Although the trial record contains sufficient direct and circumstantial evidence to have supported appellant's conviction, her conviction cannot stand when it is based upon an unfair trial. Appellant had the right to present the two excluded pieces of evidence to further her theory of defense and receive a fair trial.

## DECISION

The trial court abused its discretion and denied appellant a fair trial when it excluded two pieces of evidence that inculpated a third party, that had adequate foundation, and that would have supported appellant's theory of defense. Appellant's conviction is reversed. This case is remanded for a new trial.

**Reversed and remanded.**